**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

|  |  |
|---|---|
| VINCENT I. RATULOWSKI, on behalf of himself and all others similarly situated,<br><br>Plaintiff<br><br>v.<br><br>PNC BANK, N.A. d/b/a PNC AUTO FINANCE,<br><br>Defendant | Case Number:<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>MULTI-STATE CLASS ACTION COMPLAINT</u>

Plaintiff Vincent I. Ratulowski ("Plaintiff"), on behalf of himself and all others similarly situated, alleges the following against Defendant PNC Bank, N.A. d/b/a PNC Auto Finance ("PNC" or "Defendant"), based on personal knowledge as to Plaintiff, and on information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through Plaintiff's counsel.

## <u>INTRODUCTION</u>

1.     This action concerns PNC's practice of knowingly collecting unearned fees for Guaranteed Automobile Protection ("GAP") agreements after the early payoff of a customer's retail installment sales contract (also referred to herein as the "finance agreement"). PNC knows these fees have not been earned, and will never be earned, but nevertheless includes them in the payoff amount when the customer pays off their finance agreement early. PNC then refuses to refund these unearned GAP fees to its customers, even though PNC is contractually and legally obligated to do so as the assignee/creditor/lienholder of the finance agreement and GAP agreement. As a result of this practice, PNC knowingly collects and keeps millions of dollars of unearned GAP fees from its customers each year.

1

2.      On or about December 11, 2015, Plaintiff entered into a finance agreement with a GAP addendum in the State of Indiana, which was subsequently sold and assigned to PNC.  In 2013, the Indiana Department of Financial Institutions required that all GAP agreements sold in the State of Indiana must provide that customers will automatically receive a refund of unearned GAP fees upon early payoff of the finance agreement and that customers cannot be required to ask for a refund as a prerequisite for a refund.  PNC, nevertheless, has been violating Indiana law by failing to automatically issue a refund of unearned GAP fees after an early payoff, and requiring customers to first request a refund.

3.      There are at least eleven (11) States that have statutes or regulations expressly requiring creditors (like PNC) to automatically issue a refund of unearned GAP fees after an early payoff without requiring a request for a refund from the customer.   Those States include: (1) Alabama; (2) Colorado; (3) Indiana; (4) Iowa; (5) Massachusetts; (6) New Jersey; (7) Oregon; (8) Texas; (9) Vermont; (10) Wisconsin and (11) Wyoming (the "Automatic Refund States"). Plaintiff is informed and believes, and on that basis alleges, that PNC has been violating the laws in the Automatic Refund States (the "Automatic Refund Laws") in the same fashion as Indiana. Accordingly, Plaintiff is bringing this multi-state class action on behalf of himself and similarly situated consumers in the Automatic Refund States.

## FACTUAL BACKGROUND

4.      **What is a Retail Installment Sales Contract?**  Plaintiff and the Class financed the purchase of their cars by entering retail installment sales contracts with auto dealers (the "dealers").  Under the agreements, Plaintiff and the Class agreed to pay for the price of their cars in the future over a fixed period of years, with interest, in monthly installment payments.  The dealers then immediately sold and assigned those contracts to PNC.  Thereafter, all future payments on the contracts were made directly to PNC and the only two parties to the contracts were PNC, on the one hand, and the customers, on the other hand.

5.      **What is the difference between a Retail Installment Sales Contract and a Loan?**  Although similar, a retail installment sales contract (also referred to herein as the "finance

agreement") is different from an auto loan. As the U.S. Consumer Financial Protection Bureau explains: "A loan is a transaction between you and a bank or other lender for money, where you use the money to purchase a vehicle and agree to repay the loan balance plus interest. A retail installment sale, on the other hand, is a transaction between you and the dealer to purchase a vehicle where you agree to pay the dealer over time, paying both the value of the vehicle plus interest. A dealer could sell the retail installment sales contract to a lender or other party." *See What is a retail installment sales contract or agreement? Is this a loan?*, CFPB (June 8, 2016), www.consumerfinance.gov/ask-cfpb/what-is-a-retail-installment-sales-contract-or-agreement-is-this-a-loan-en-817. The latter scenario is exactly what happened in the present case. Plaintiff and the Class entered retail installment sales contracts with the dealers, which were then immediately sold and assigned to PNC. Thereafter, PNC became the creditor on the agreements.

6.     **What is a GAP Agreement?** Each of the finance agreements at issue in this lawsuit included a GAP agreement. A GAP agreement is an addendum to the finance agreement which amends the terms of the contract and becomes a part of the agreement. It is a debt



cancellation agreement, which provides that in the event a customer suffers a "total loss" of their vehicle and the actual cash value of their vehicle is worth less than the balance owed to the creditor (e.g., PNC), then the creditor (PNC) will agree to waive the difference. This difference is known as the "GAP event."

7.     For example, assume a customer's car is stolen and the customer still owes $10,000 in payments on their finance agreement. Also, assume the customer's liability insurer only agrees to pay $8,000 for the "total loss" of the vehicle. Without a GAP agreement, the customer would still owe the $2,000 difference to the creditor on the contract (PNC), even though the customer no longer possesses the vehicle. However, if the finance agreement has a GAP agreement, then the creditor (PNC) is required to "waive" the $2,000 difference.

8.      **What are GAP Administrators?**   The GAP agreements are standard form contracts prepared by third-party companies known as "GAP Administrators."   The GAP Administrators also perform administrative services for the creditor in connection with the GAP Agreement.   The GAP Administrators *are not* parties to the GAP contract between the creditor and the customer.   Instead, the GAP Administrators perform the services as an agent for the creditor.

9.      **How does a customer pay for GAP Coverage?**   Customers pay for GAP coverage in monthly installments over the life of their finance agreements.   The total cost of GAP coverage for the full term of the finance agreement is separately listed on the contract as part of the total amount financed (the "GAP fees").   The finance agreement will also list the total amount of interest that the customer will pay over the full term of the contract (the "finance charge").   However, while the customer is told up-front what the total cost of the GAP coverage and finance charge will be for the full term of the finance agreement, the customer pays those amounts incrementally over time to PNC on a month-to-month basis, which is included in the monthly payments for their car.

10.      **What are Unearned GAP Fees?**   When customers pay off their finance agreements early (before the original maturity date) this results in what PNC and the rest of the auto finance industry refer to as "unearned GAP fees."   For example, if the total cost of GAP protection for four years of GAP coverage is $800, but the customer pays off their finance agreement in two years, this results in $400 of "unearned GAP fees" for the unused half of the contract.   This portion of the GAP fees is "unearned" because once the finance agreement is paid-off early, there is no possibility of a GAP event to protect against and the customer is no longer receiving anything of value by paying for future GAP coverage.

11.      **What are Unearned Finance Charges?**   Similar to unearned GAP fees, when customers pay off their finance agreements early (before the original maturity date), it results in "unearned finance charges."   The term "unearned finance charges" refers to the difference between the interest that has accrued up to the date of the early payoff and the total finance charge listed on

4

the finance agreement. This portion of the finance charge is "unearned" because the customer no longer owes interest for the unused term of the finance agreement.

12. **How is PNC Collecting and Keeping Unearned GAP Fees?** When customers want to pay off their finance agreements early, PNC informs its customers of the total payoff amount. PNC does not include the unearned finance charge in the total payoff amount quoted to customers, but it will include the unearned GAP fees. In other words, at the time of the early payoff, PNC charges customers for GAP coverage through the original end date of the finance agreement, even though the contracts are being paid off early. PNC then collects and keeps these unearned GAP fees, unless the customer affirmatively requests a refund, which rarely happens. As a result of this practice, PNC routinely collects and keeps tens of millions of dollars of unearned money *each year* that rightfully belongs to its customers and should be refunded to them after their early payoff.

13. **PNC Always Knows Its Customers are Entitled to a Credit or Refund of Unearned GAP Fees When There is an Early Payoff of the Finance Agreement.** PNC *always* knows when there has been an early payoff of the finance agreement because PNC, as the creditor, is the entity receiving the early payoff. Likewise, PNC *always* knows its customers are entitled to a credit or refund of the unearned GAP fees after an early payoff, because PNC knows that once the finance agreement is terminated early, there is no basis for continuing to charge customers for future GAP coverage. Consequently, there is no legitimate basis for PNC to include the unearned GAP fees in the early payoff amount quoted to customers, nor is there any legitimate basis to collect such unearned money from its customers and then refuse to give it back to them unless they affirmatively request a refund.

14. **The "Automatic Refund States."** As noted above, there are at least eleven (11) States, including the State of Indiana, that have statutes or regulations expressly requiring creditors (like PNC) to automatically issue a refund of unearned GAP fees after an early payoff without requiring customers to request a refund. Those States include:

(a)    **Alabama**: Ala. Code § 8-37-6(b) (effective Jan 1, 2018) ("In the event of cancellation of the GAP waiver due to early termination of the finance agreement, the creditor shall provide, or cause the administrator or retail seller to provide, within 60 days of termination, any refund due to a borrower without requiring the borrower to request cancellation of the waiver."); *see also* Al. Admin. Code § 155-2-2-.13 (effective October 1, 1997) (requiring creditor to issue refund of unearned premiums);

(b)    **Colorado:** 4 Colo. Code Regs. § 902-1:8(h) (effective July 30, 2009) ("If the consumer credit sale or consumer loan is prepaid prior to maturity. . . the creditor must refund to the consumer the unearned fee or premium paid for GAP");

(c)    **Indiana:** Indiana Department of Financial Institutions, Standardized GAP Agreements, p. 6, ¶ 15 (in effect since 2013) ("Upon prepayment in full of the credit agreement, the GAP coverage is automatically terminated . . . The consumer is not required to ask for a refund");[1] *see also* Ind. Code § 24-.45-3-202(f)(iii), (g) (effective July 1, 2018) ("Upon prepayment in full of the consumer loan: (i) the GAP coverage is automatically terminated; and (ii) the seller of the GAP agreement must issue a refund in accordance with subdivision (f)" which provides "[t]he seller of the GAP agreement, or the seller's assignee, is responsible for making a timely refund to the consumer of unearned GAP agreement charges under the terms and conditions of the GAP agreement");

(d)    **Iowa:**    Iowa Code § 537.2510(1) (effective June 30, 2012) ("Upon prepayment in full of a precomputed consumer credit transaction, the creditor shall rebate to the consumer . . . any other unearned charges including charges for insurance.");

(e)    **Massachusetts:** Mass. Gen. Laws 255B § 16 (effective April 7, 2015) ("Notwithstanding the provisions of any retail installment contract to the contrary, any buyer may pay in full at any time before maturity the debt of any retail installment contract, and in so paying

---

[1] *See* former Ind. Code 24-4.5-2-202(1)(c) and Indiana Code 24-4.5-3-202(1)(e) requiring all GAP programs offered to Indiana consumers to first be approved by the Indiana Department of Financial Institutions in accordance with its standards and guidelines.

such debt shall receive a refund credit thereon for such anticipation."); *see also* Mass. Gen. Laws 140D § 22 (effective since 1985) ("Whenever a credit balance equal to or in excess of one dollar is created in connection with a consumer transaction through . . . (2) rebates of unearned finance charges or insurance premiums or (3) amounts otherwise owed to or held for the benefit of an obligor, the creditor shall . . . (c) make a good faith effort to refund to the consumer by cash, check or money order any part of the amount of the credit balance remaining in the account for more than six months, within thirty days after the expiration of the six-month period.");

(f)    **New Jersey:**  N.J.S. § 17:16BB-6 (effective Oct. 17, 2019) ("The creditor shall provide, or cause the administrator or retail seller to provide, the borrower any refund due pursuant to this section within 60 days of the event terminating the finance agreement, without requiring the borrower to request the refund.");

(g)    **Oregon:** O.R.S. § 646A.781(1)(b), (2)(b) (effective January 1, 2016) ("If the guaranteed asset protection waiver is cancelled as a result of the termination of the finance agreement, then any cancellation refund shall be provided without requiring the borrower to apply or submit a claim for the refund" and "If the borrower has paid the obligation in full, the creditor shall pay to the borrower the refund.");

(h)    **Texas:** Tex. Fin. Code § 354.007(e) ("If the debt cancellation agreement terminates due to the early termination of the contract, the holder shall, not later than the 60th day after the date the debt cancellation agreement terminates: (1) refund or credit an appropriate amount of the debt cancellation agreement fee; or (2) cause to be refunded or credited an appropriate amount of the debt cancellation agreement fee by providing written instruction to the appropriate person.");

(i)    **Vermont:** 8 V.S.A. § 10405(c)(11) (effective since 2005) ("In the event of termination or cancellation of the contract [debt cancellation agreement], the creditor must refund any unearned fee according to the formula fully disclosed to the borrower at the time of entering

7

into the debt protection agreement, unless the contract provides otherwise.");[2] *see also* 8 V.S.A. § 10405(b)(1)(A) (defining debt cancellation agreement as including "a guaranteed asset protection waiver agreement.");

(j)    **Wisconsin:** Wis. Stat. § 218.0148(4)(g) (effective since September 1, 2018) ("Upon cancellation or termination of a guaranteed asset protection waiver, the creditor shall make an appropriate refund or credit of the guaranteed asset protection waiver charge or shall cause to be made an appropriate refund or credit by instructing in writing the appropriate party to make the refund or credit."); and

(k)    **Wyoming:** Wyo. Stat. § 40-14-454 (a) (effective July 1, 2021) ("Not later than sixty (60) days after termination of a consumer credit sale or consumer loan, a creditor shall facilitate any refund or credit otherwise required by law for insurance or other loan products that provide protection to a consumer and cease when termination of the credit transaction occurs, including guaranteed asset protection waivers and debt cancellation contracts.").

15.    In *Herrera, et al. v. Wells Fargo*, Case No. 8:18-cv-00332-JVS-MRW, Dkt. No. 201 (C.D. Cal. June 8, 2021), the district court found that the Automatic Refund Laws are "substantially similar, meaning that common questions of law will predominate." *Id.* at 11.

16.    The Automatic Refund Laws affect the validity, construction and enforcement of the finance agreements and GAP agreements, and are, thus, incorporated into those agreements.

17.    **PNC's "Condition Precedent" Defense.** PNC may contend that customers must provide written notice of the early payoff and/or a written request for a refund as a "condition precedent" to the refund. This argument is unavailing for several reasons.

a.    *First*, under the Automatic Refund Laws at issue in this class action, the customers cannot be required to request a refund after an early payoff as a "condition precedent" to the refund.

---

[2] The Vermont statute further explains that "[a] debt protection agreement that does not provide for a refund may only be offered if an offer is also made of a bona fide option to purchase a comparable contract that provides for a refund." 8 V.S.A. § 10405(c)(11).

b. *Second*, PNC always receives written notice of the early payoff from the customer because PNC is the creditor collecting the early payoff. PNC receives the payoff via a written instrument (check, electronic payment, wire or money order) and PNC records the early payoff in writing in its records. PNC also sends a payoff letter confirming the early payoff in writing. Consequently, the purpose of any notice provision is fully satisfied because PNC always receives written notice of the early termination of the finance agreement, thereby triggering PNC's refund obligation.

c. *Third*, interpreting a contract provision as a "condition precedent" is strongly disfavored under the law, because of the risk that if the condition is not perfectly performed it may result in a forfeiture (in this case, the forfeiture of unearned money). Ambiguous language is strictly construed against the party seeking to enforce the condition precedent.

d. *Fourth*, the failure to perform a "condition precedent" will be excused if it results in a "disproportionate forfeiture." In determining whether there is a "disproportionate forfeiture," the trier of fact is instructed to consider the purpose of the condition precedent and weigh the harm of excusing non-performance verses the harm of enforcing the condition. Here, because PNC is always on notice of the early payoff, any deviation from performing the "condition precedent" would be trivial and cause no harm to PNC. On the flip side, the failure to excuse a trivial deviation will result in customers forfeiting refunds of unearned money and allow PNC to collectively keep *millions of dollars* of fees it did not earn, and which can never be earned. This is the very definition of "disproportionate."

18. **PNC is the Party that Owes the Refund Obligation under the GAP Agreement.** PNC may also contend that it is not the party that owes the refund obligation under the GAP agreement. This argument is wrong as a matter of law.

a. *First*, after PNC is assigned the GAP agreement, it is the only party to the contract with the customer. As the assignee and creditor, PNC "steps into the shoes" of the assignor (the dealer) and assumes all the benefits and obligations of the finance agreement and GAP addendum, including, but not limited to, the GAP agreement's contractual obligation to

9

refund unearned GAP fees after an early payoff. In other words, just like PNC assumes the contractual obligation as the creditor to waive the GAP in the event of a "total loss" of the vehicle, PNC also assumes the contractual obligation to issue the refund of the unearned GAP fees. Simply put, after the assignment, there are only two parties to the contract, PNC and the customer, and thus PNC is the only party that could possibly owe the refund obligation under the contract.

b.      *Second*, every finance agreement in this case, as a matter of federal law, is required to include a provision disclosing that: "Any holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof" up to the amount paid by the debtor under the agreement. *See* 16 C.F.R. § 433.2. This regulation, known as the "holder rule," codifies the principle that the assignee of the finance agreement (PNC) "steps into the shoes" of the original seller (the dealer) and is responsible for all claims the debtor (the customer) could have originally asserted against the seller (the dealer). Consequently, whereas the dealer initially owed the GAP agreement's refund obligations to the customer as the original seller, PNC took over those obligations once it became the "holder" of the contract as the assignee.

19.      In sum, PNC breached its contracts with Plaintiff and the Class Members, and violated the laws in the Automatic Refund States, including Indiana, by failing to refund the unearned GAP fees it collected after Plaintiff and the Class Members paid off their finance agreements early. PNC is continuing its fraudulent, unfair and unlawful practice of including unearned GAP fees in the total payoff amount quoted to customers and refusing to automatically issue a credit or refund of those fees to its customers upon an early payoff. Plaintiff intends to enter finance agreements with GAP agreements in the future which may be assigned to PNC and he is, thus, at risk of being harmed by this practice in the future, just like the rest of the Class and the general public. Thus, Plaintiff on behalf of himself, the Class, and the general public is seeking:

a.      An order requiring PNC to refund all unearned GAP fees it collected after the early payoff of the finance agreement to every customer in the United States who entered into a GAP Agreement in one of the Automatic Refund States;

b.    An order requiring PNC to pay the interest that accrued on those delinquent refunds;

c.    An order requiring PNC, on a go-forward basis, to either: (i) issue a credit for the unearned GAP fees in the early payoff amount quoted to customers; or (ii) directly refund those unearned fees back to the customer within a reasonable time after the early payoff of the finance agreement in conformance with the laws in the Automatic Refund States; and

d.    Damages, restitution and all other relief as may be just and proper.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class Member is of diverse citizenship from one of the defendants, there are 100 or more Class Members, and the aggregate amount in controversy exceeds $5,000,000.

21.    Venue is proper in the Northern District of Indiana under 28 U.S.C. § 1391.  PNC regularly conducts business in the Northern District and a substantial part of the events giving rise to the claims asserted herein occurred in this district in Lake County, Indiana.

## THE PARTIES

22.    At all relevant times, Plaintiff Vincent I. Ratulowski ("Plaintiff") has been a citizen of the State of Indiana, and a resident of Griffith, Indiana.

23.    At all relevant times, Defendant PNC Bank, N.A., d/b/a PNC Auto Finance ("PNC") has been a national association bank chartered in the State of Delaware.  PNC is the assignee of the finance agreements and GAP agreements of Plaintiff and the Class.

## FACTS RELATING TO PLAINTIFF

24.    Plaintiff is an individual (a) who entered into a finance agreement with a GAP addendum that was assigned to PNC; (b) who paid off his finance agreement to PNC before the end of the contract term set forth in the agreement; and (c) who did not receive a refund of the unearned GAP fees collected by PNC and/or the accrued interest on those unpaid fees.

25.    On or about December 11, 2015, Plaintiff purchased a 2016 Chevrolet Cruze from Christenson Chevrolet, Inc. in Highland, Indiana.  Plaintiff financed the purchase of his car by entering into a finance agreement with a 75-month term.  *See Exhibit A.*

26.    Plaintiff's finance agreement included a GAP addendum.  *See Exhibit B.*  The cost of 75 months of GAP coverage was $506.00.

27.    Plaintiff's finance agreement and GAP addendum were assigned to PNC immediately upon Plaintiff's execution of the finance agreement.

28.    PNC is listed as the "Financial Institution/Lender" on Plaintiff's GAP addendum.

29.    Plaintiff's GAP addendum states: "This GAP Waiver Addendum will terminate without notice if the following occur: (1) When the Installment Sales Contract / Lease Agreement terminates; (2) Upon cancelation of the Installment Sales Contract / Lease Agreement prior to its expiration or (3) in the event that the vehicle listed on the front of the GAP Waiver Addendum is sold, assigned or transferred by you before the expiration of the Installment Sales Contract / Lease Agreement."  *Exhibit B*, *p. 2.*

30.    Plaintiff's GAP addendum further states that "This GAP Waiver Addendum . . . may be cancelled for a full refund within sixty (60) days of the Origination Date. . . After sixty (60) days from the Origination Date, any refund will be calculated using a pro-rata method unless otherwise required by state regulatory laws, less a $35 cancellation fee."  *Exhibit B*, *p. 2.*

31.    On or about April 2, 2020, Plaintiff paid off his finance agreement early and traded-in his vehicle resulting in an automatic termination of his GAP Waiver Addendum.

32.    PNC received written notice of the early payoff and recorded the pay-off date, in writing, in PNC's computer records.

33.    Despite its notice of the early payoff, PNC included the unearned GAP fees in the early payoff amount and failed to refund Plaintiff his unearned GAP fees within a reasonable time after receiving written notice of the early payoff.  To date, PNC still has not paid Plaintiff his refund in breach of the GAP agreement and Indiana law.  PNC owes Plaintiff approximately $156.99 in unearned GAP fees, excluding interest.

## CLASS ACTION ALLEGATIONS

34.     **Class Definition.** Plaintiff brings this action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class: All persons (1) who entered into finance agreements with GAP addendums in an Automatic Refund State that were assigned to PNC; (2) who paid off their finance agreements before the end of the contract term during the time period that an Automatic Refund Law was in effect; and (3) who did not receive a credit or refund of the unearned GAP fees and/or the accrued interest on those unpaid amounts.  The class period is based on the applicable statutes of limitations in each of the Automatic Refund States. For purposes of this Class definition, the Automatic Refund States are: (1) Alabama; (2) Colorado; (3) Indiana; (4) Iowa; (5) Massachusetts; (6) New Jersey; (7) Oregon; (8) Texas; (9) Vermont; (10) Wisconsin; and (11) Wyoming.

35.     **Indiana Subclass Definition.**  Plaintiff also brings this action on behalf of the following Subclass: All persons (1) who entered into finance agreements with GAP addendums in the State of Indiana that were assigned to PNC; (2) who paid off their finance agreements before the end of the contract term during the time period that an Automatic Refund Law was in effect; and (3) who did not receive a credit or refund of the unearned GAP fees and/or the accrued interest on those unpaid amounts.  The class period is based on the applicable statutes of limitations in Indiana.

36.     Excluded from the proposed Class are: (a) Defendant and its agents, officers, directors, parent companies, subsidiaries, and affiliates; (b) counsel representing Plaintiff and any person employed by counsel; and (c) any judicial officers assigned to this case and their staff.

37.     Plaintiff reserves the right to revise the definition of the Class based upon subsequently discovered information.

38.     **Numerosity:** While the exact number of the members of the Class and Subclass are unknown to Plaintiff at this time, membership in the Class and Subclass may be ascertained from the records maintained by PNC.  At this time, Plaintiff is informed and believes that the Class includes tens of thousands of members, and the Subclass includes thousands of members.

Therefore, the Class and Subclass members are sufficiently numerous that joinder of all members in a single action is impracticable under Fed. R. Civ. P 23(a)(1), and the resolution of their claims through a class action will be of benefit to the parties and the Court.

39.    **Ascertainability:** The names and addresses of the members of the Class and Subclass are contained in PNC's records. Notice can be provided to the members of the Class and Subclass through direct mailing, publication, or otherwise using techniques and forms of notice similar to those customarily used in consumer class actions arising under state and federal law.

40.    **Common Facts:** Common facts exist as to all members of the Class and Subclass and predominate over any issues affecting individual members of the Class and Subclass. The common facts include the following:

a.    Plaintiff and the members of the Class and Subclass entered into finance agreements with GAP addendums in Automatic Refund States.

b.    The finance agreements and GAP addendums were purchased by and assigned to PNC.

c.    Every finance agreement entered by Plaintiff and the members of the Class and Subclass contained a provision stating that: "Any holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof."

d.    PNC was the assignee and "holder" of every finance agreement and GAP agreement entered by Plaintiff and the members of the Class and Subclass.

e.    The total purchase price for GAP coverage for the full term of the finance agreement was listed as a separate line item on the first page of the finance agreement and included in the total amount financed.

f.    After the assignment to PNC, Plaintiff and the members of the Class and Subclass were required to make all payments under the finance agreements to PNC with interest, including, but not limited to, the monthly payment of GAP fees.

g.      PNC, as the purchaser and assignee of the finance agreement, was the lienholder/creditor/financial institution/lender/finance company/assignee of every GAP agreement entered by Plaintiff and the members of the Class and Subclass.

h.      When a GAP agreement is terminated before the end of the contract term, PNC, and the auto finance industry, refer to the unused portion of the GAP fees as "unearned fees" or "unearned GAP fees."

i.      Every GAP form at issue in this lawsuit provides that customers have the right to cancel the GAP agreement at any time and receive a refund of the unearned GAP fees.

j.      Every GAP agreement at issue in this lawsuit is automatically cancelled and terminated when the finance agreement is paid off before the end of the contract term.

k.      Plaintiff and the members of the Class and Subclass paid off the balances on their finance agreements early – *i.e.*, before the end of the original contract term.

l.      PNC received written notice that Plaintiff and the members of the Class paid off their finance agreements before the end of the original contract terms.

m.      PNC possessed, and possesses, all of the information necessary to calculate the unearned GAP fees when Plaintiff and the members of the Class and Subclass paid off their finance agreements early, including (1) the method for calculating the refund (*e.g.*, the pro-rata method); (2) the total purchase price for GAP coverage for the full term of the contract; (3) the date of the early payoff and resulting cancellation of the GAP agreement; and (4) the amount of time remaining under the original contract term.

n.      Rather than deduct the unearned GAP fees from the total payoff amount, PNC's common policy and practice throughout the United States is to include the unearned GAP fees in the total payoff amount quoted to customers when they seek to pay off their finance agreements early.

o.      In conformance with its common policy and practice, PNC included the unearned GAP fees in the total payoff amount quoted to Plaintiff and the members of the Class and Subclass.

15

p.      In conformance with its common policy and practice, PNC collected unearned GAP fees from Plaintiff and the members of the Class and Subclass and did not refund the unearned GAP fees to Plaintiff and the members of the Class and Subclass in violation of the GAP agreements and Automatic Refund Laws.

q.      PNC's common policies and practices with respect to GAP agreements are the same regardless of the language in the GAP forms.  In other words, PNC treats all GAP forms as uniform in its business operations.

41.     **Common Questions of Law:** Common questions of law exist as to all members of the Class and Subclass and predominate over any issues solely affecting individual members of the Class and Subclass.  The common questions of law include, but are not limited to:

a.      Whether the early payoff of the finance agreement automatically cancels the GAP agreement.

b.      Whether PNC, as the assignee, takes over the contractual obligation to the customer to issue a credit or refund of unearned GAP fees.

c.      Whether the Automatic Refund Laws require PNC, as the assignee and creditor of the finance agreement and GAP addendum, to automatically issue a refund of unearned GAP fees after the early payoff of the finance agreement.

d.      Whether the unearned GAP fees constitute money that in equity and good conscience belongs to Plaintiff and the members of the Class and Subclass.

e.      Whether Plaintiff and the members of the Class and Subclass are entitled to damages and restitution in the amount of the unearned GAP fees, as well as the accrued interest on those unpaid amounts.

f.      Whether Plaintiff and the members of the Class and Subclass are entitled to an award of reasonable attorneys' fees and costs.

g.      Whether the Court should issue an injunction requiring PNC to either: (1) refrain from including unearned GAP fees in the total payoff amount quoted to customers; or (2)

automatically refund those unearned fees back to the customer within a reasonable time after the early payoff of the finance agreement.

42.     **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class and Subclass. Plaintiff has been subjected to the same wrongful business practices and has been damaged in the same manner. Specifically, PNC included unearned GAP fees in the total payoff amount quoted to Plaintiff and then proceeded to collect those unearned GAP fees without issuing a credit or refund to Plaintiff after his early payoff, nor paying interest on the delinquent amounts.

43.     **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of the Class and Subclass as required by Fed. R. Civ. P. 23(a)(4). Plaintiff is an adequate representative of the Class and Subclass because he does not have any interests that are adverse to the interests of the members of the Class and Subclass. Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained counsel who are competent and experienced in handling class action litigation on behalf of consumers, including the specific claims at issue in this lawsuit.

44.     Plaintiff's interests are co-extensive with, and not antagonistic to, those of the absent members of the Class and Subclass. Plaintiff will undertake to represent and protect the interests of the absent members of the Class and Subclass.

45.     Plaintiff has engaged the services of the undersigned counsel. Counsel is experienced in complex consumer class action litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiff and the absent members of the Class and Subclass.

46.     **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of the claims asserted in this action under Fed. R. Civ. P. 23(b)(3) because: (1) the Class and Subclass members do not have an interest in individually controlling the prosecution of separate actions; (2) there is no pending litigation concerning the controversy already begun by Class and Subclass members; (3) it is desirable to concentrate the litigation of the claims in this particular forum; and (4) there will be no difficulties in managing this case as a

class action. The superiority requirement is satisfied because a class action here would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

47.     **Predominance:** Class action status is warranted under Fed. R. Civ. P. 23(b)(3) because questions of law or fact common to the members of the Class and Subclass predominate over any questions affecting only individual members.  The interests of the members of the Class and Subclass in individually controlling the prosecution of separate actions are theoretical and not practical.  Prosecution of this action through a Class Representative would be superior to individual lawsuits.  Plaintiff is not aware of any difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

### FIRST CLAIM
### BREACH OF CONTRACT
#### (On Behalf of Plaintiff and the Class and Subclass)

48.     Plaintiff hereby repeats, realleges and incorporates by reference each and every allegation contained above as though the same were fully set forth herein.

49.     Plaintiff brings this claim on behalf of himself and the members of the Class and Subclass.

50.     Plaintiff and the members of the Class and Subclass entered into finance agreements with GAP addendums in Automatic Refund States that were sold and assigned to PNC.

51.     After the assignment, the only two contracting parties to the GAP agreement were Plaintiff and the members of the Class and Subclass, on the one hand, and PNC, on the other hand.

52.     The GAP agreements and the Automatic Refund Laws provide that the creditor on the agreement (which, after the assignment, is PNC) will issue a credit or refund of unearned GAP fees if the GAP agreement is cancelled before the end of the original contract term, so long as the creditor (PNC) has not been required to waive any GAP amounts under the agreement.

53.     Plaintiff and the members of the Class and Subclass paid off their finance agreements early, which resulted in the automatic cancellation and termination of the GAP agreements before the end of the original contract term.

54.     At the time of the early payoff, PNC included the unearned GAP fees in the total payoff amount quoted to Plaintiff and the members of the Class and Subclass.

55.     Plaintiff and the members of the Class and Subclass paid the total payoff amount to PNC, including the unearned GAP fees.

56.     PNC received written notice that Plaintiff and the members of the Class and Subclass paid off their finance agreements early (i.e., prior to the end of the original contract term).

57.     Plaintiff and the members of the Class and Subclass actually and substantially complied with their contractual obligations under the finance agreements and GAP addendums to the extent they were legally required to do so.

58.     In breach of the finance agreements and GAP addendums, and in violation of the Automatic Refund Laws, PNC wrongfully collected the unearned GAP fees upon the early payoff of the finance agreements and failed to refund those amounts to Plaintiff and the members of the Class and Subclass as required by the Automatic Refund Laws.

59.     Plaintiff and the members of the Class and Subclass were harmed, suffered out-of-pocket loss, and did not receive the benefit of their bargains because PNC failed to issue a credit or refund of the unearned GAP fees within a reasonable time after the early payoff of the finance agreements and failed to pay the interest that accrued on those unpaid amounts.

60.     PNC is liable to Plaintiff and the members of the Class and Subclass for the damages they suffered as a direct result of PNC's collection and failure to issue a refund of the unearned GAP fees within a reasonable time after the early payoff, as well as the interest that accrued on those unpaid amounts.

61.     As noted above, because PNC received actual notice of the early payoff, allowing PNC to keep these unearned GAP fees would result in a disproportionate forfeiture.  Plaintiff and the members of the Class cannot currently obtain a refund of these amounts.

**SECOND CLAIM**
**MONEY HAD & RECEIVED**
**(On Behalf of Plaintiff and the Class and Subclass)**

62.     Plaintiff hereby repeats, realleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 47 above as though the same were fully set forth herein.

63.     Plaintiff and the members of the Class and Subclass paid off their finance agreements early, i.e., before the original maturity date.

64.     Shortly before their early payoffs, PNC informed Plaintiff and the members of the Class and Subclass about the total amount of money they would need to send PNC if they wanted to pay off their finance agreements early.  PNC did not include the unearned finance charge in the total payoff amount quoted to Plaintiff and the members of the Class and Subclass, but it did include the amount of the unearned GAP fees.[3]  In other words, at the time of the early payoff, PNC fraudulently represented to Plaintiff and the members of the Class and Subclass that they owed PNC the unearned GAP fees for the remaining term of the finance agreement, even though PNC knew these fees were not earned, and could never be earned, because the finance agreement was terminating early.

65.     PNC included the unearned GAP fees in the total payoff amount with the intent that Plaintiff and the members of the Class and Subclass would rely on that representation and believe that those fees were earned and owed to PNC and would, thus, pay those fees to PNC.

---

[3] To be specific, the finance charges included in the payoff quote included the finance charges owed if the customer paid off the finance agreement on the date the payoff quote expired.  The quotes did not include unearned finance charges for the period after the date the payoff quote expired.  If the customer paid off the finance agreement before the quote expired, a portion of the payoff would include "unearned finance charges" but that amount would then be refunded by PNC. For example, assume on September 1, 2021, PNC issued a payoff quote of $100 good through September 10, 2021 and that payoff quote included $10 in unearned finance charges ($1 per day). If the customer paid $100 on September 5, 2021, the customer would receive a refund of $5 in unearned finance charges.  In contrast, PNC included the full amount of the unearned GAP fees for the period after expiration of the payoff quote and did not refund that amount.

66.    In actual and justifiable reliance on PNC's representations, Plaintiff and the members of the Class and Subclass were compelled to pay PNC the total payoff amount quoted by PNC, including the unearned GAP fees.

67.    If Plaintiff and the members of the Class and Subclass did not pay the total amount quoted by PNC, including the unearned GAP fees, then PNC would not release its lien on the vehicle and Plaintiff and the members of the Class and Subclass would suffer resulting injury thereby.

68.    Plaintiff and the members of the Class and Subclass did not receive any consideration for the unearned GAP fees collected by PNC.

69.    PNC maintains possession of the unearned GAP fees belonging to Plaintiff and the members of the Class and Subclass.  This is money that in equity and good conscience belongs to Plaintiff and the members of the Class and Subclass.

70.    PNC obtained the unearned GAP fees through false pretenses as set forth in Paragraphs 64 and 65 above and it would be unjust to allow PNC to keep these unearned GAP fees under these circumstances.

71.    Plaintiff and the members of the Class and Subclass seek restitution of the unearned GAP fees collected and retained by PNC, as well as the interest that accrued on those amounts.

72.    To the extent necessary, Plaintiff pleads this claim in the alternative to the breach of contract claim.

**THIRD CLAIM**
**DECLARATORY RELIEF**
**(On Behalf of Plaintiff and the Class and Subclass)**

73.    Plaintiff hereby repeats, realleges and incorporates by reference each and every allegation contained above as though the same were fully set forth herein.

74.    There exists a present controversy between the parties as to the following issues with respect to the GAP agreements at issue in this lawsuit:

a. Whether PNC, as the assignee, took over the contractual obligation to pay the refund of unearned GAP fees to the customer to the extent a refund is owed under the GAP agreements at issue in this lawsuit.

b. Whether PNC is required to pay interest on any unearned GAP fees that it collects when the finance agreement has been paid off early and which it subsequently fails to issue a refund within a reasonable time thereafter.

75. Plaintiff and the members of the Class and Subclass contend PNC owes these obligations. PNC denies that it owes such obligations.

76. Plaintiff, the Class and Subclass and the members of the general public, as well as PNC, will benefit from these declarations because Plaintiff, the Class and Subclass and members of the general public will enter into GAP agreements in the future which may be subsequently assigned to PNC, and the requested declarations will serve a useful purpose in establishing PNC's future obligations. It is potentially possible that these issues may not be resolved in connection with the breach of contract claim in the event that PNC prevails on its other defenses to that claim.

77. Accordingly, Plaintiff and the members of the Class and Subclass hereby request the Court issue an order declaring that:

a. PNC, as the assignee, took over the contractual obligation to pay the refund of unearned GAP fees to the customer to the extent a refund is owed under the GAP agreements at issue in this lawsuit.

b. PNC is required to pay interest on any unearned GAP fees that it collects when the finance agreement has been paid off early and which it subsequently fails to issue a refund within a reasonable time thereafter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against PNC and in favor of Plaintiff and the members of the Class and Subclass and award the following relief:

1. An order certifying this lawsuit as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, appointing Plaintiff as the representative of the Class and

Subclass, and appointing Plaintiff's counsel as Class Counsel for the Class and Subclass;

2. An order declaring the following:

   a. PNC, as the assignee, took over the contractual obligation to pay the refund of unearned GAP fees to the customer to the extent a refund is owed under the GAP agreement; and

   b. PNC is required to pay interest on any unearned GAP fees that it collects when the finance agreement has been paid off early and which it subsequently fails to promptly refund;

3. An injunction requiring that PNC either: (1) refrain from collecting unearned GAP fees upon an early payoff of the finance agreement; or (2) automatically refund those unearned fees, plus interest, back to the customer within a reasonable time after the early payoff of the finance agreement;

4. An award to Plaintiff and the members of the Class and Subclass of all appropriate relief, including actual damages, restitution and disgorgement of the unearned GAP fees;

5. An award of all costs for prosecuting the litigation, including expert fees;

6. An award of pre- and post-judgment interest;

7. An award of attorneys' fees; and

8. An order granting any such additional relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury as to all claims in this action so triable.

Dated: January 7, 2022                         By:    /s/ *Robert W. Rock*
                                               Robert W. Rock (Ind. Bar No. 14060-48)
                                               Franklin D. Azar (to appear *pro hac vice*)
                                               FRANKLIN D. AZAR & ASSOCIATES, P.C.
                                               14426 East Evans Avenue

Aurora, CO 80014
Telephone: (303) 757-3300
rockr@fdazar.com
azarf@fdazar.com

FRANK SIMS & STOLPER LLP
Jason M. Frank (to appear *pro hac vice*)
Andrew D. Stolper (to appear *pro hac vice*)
Scott H. Sims (to appear *pro hac vice*)
19800 MacArthur Blvd., Suite 855
Irvine, CA 92612
Telephone: (949) 201-2400
jfrank@lawfss.com
astolper@lawfss.com
ssims@lawfss.com

Robert A. Clifford (to appear *pro hac vice*)
Shannon M. McNulty (to appear *pro hac vice*)
CLIFFORD LAW OFFICES, P.C.
120 N. LaSalle Street, 31stFloor
Chicago, Illinois 60602
Telephone: 312-899-9090
rclifford@cliffordlaw.com
smm@cliffordlaw.com

*Attorneys for Plaintiff*

24