UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| VINCENT I. RATULOWSKI, on behalf of himself and all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 2:22-CV-004-PPS-APR |
| | ) | |
| PNC BANK, N.A., d/b/a PNC AUTO FINANCE, | ) ) | |
| | ) | |
| Defendant. | ) | |

**<u>OPINION AND ORDER</u>**

Plaintiff Vincent Ratulowski claims that PNC Bank knowingly collects and unlawfully retains unearned insurance fees that are sold as an add-on to automobile finance agreements. He brings three claims: one for breach of contract; a second under an obscure equitable concept known as "money had and received"; and finally, he seeks a declaratory judgment relating to the parties' rights and obligations under contracts of insurance. Ratulowski also brings class claims on behalf of both a Multi-State Class and Indiana Subclass consisting of similarly aggrieved auto finance customers. PNC has moved to dismiss Ratulowski's First Amended Complaint [DE 31; DE 32; DE 35; DE 44; DE 46; DE 47], and to strike the class allegations from the complaint. [DE 33; DE 34; DE 35; DE 45; DE 46; DE 48].

For the reasons explained below, Ratulowski will be allowed to proceed with his claim for breach of contract based on PNC's alleged breach of the express terms of his finance agreement and insurance addendum. And because Ratulowski will be permitted

to proceed on that claim, his claims for "money had and received" and declaratory judgment will be dismissed. Finally, based on my findings set out below, Ratulowski is not a member of the Multi-State Class and Indiana Subclass defined in the First Amended Complaint. Accordingly, the motion to strike the class allegations will be granted. But Ratulowski will be given thirty days in which to file an amended complaint to narrow the class claims.

## Background

This is a case about "GAP fees"—shorthand for "Guaranteed Asset Protection" fees—and a creditor's legal obligation to remit any such fees paid by a customer but "unearned" by the creditor. Let's start by explaining what GAP fees are. Anybody who has visited a car lot is familiar with the idea of financing the purchase of a new car. But few are likely to understand the niceties of GAP coverage and the payment obligations attendant to such coverage in the event of an early payoff on a car loan. The typical vehicle finance agreement, like the one at the center of this case, is a contract under which the customer agrees to pay an auto dealer the price of a vehicle over a fixed period of time, with interest, through installment payments. [DE 26, ¶ 4.] Dealers then sell and assign those contracts to other entities (in this case, PNC's auto finance company), and the payments are made directly from the customer to the finance company. *Id.; see id.*, ¶¶ 27–28.

The basic idea behind GAP insurance is premised on the idea that most new cars rapidly depreciate as soon as they are driven off the lot. Suppose that someone buys a

new car for $30,000 and finances all of it. Suppose further that he drives the car for a few months, puts 10,000 miles on it and then gets in an accident and totals it. He still would owe nearly $30,000 on the car to the bank that financed the deal, but the value of the vehicle at the time it was totaled might be only $25,000. The auto insurer will only pay for the value of the car at the time it was totaled—$25,000 in my example. And the owner will have to make up the difference ($5,000) to fully pay off the lender. GAP insurance is an add-on coverage offered at the time of the sale that, as the name suggests, bridges the gap between what a car is worth and what one still owes on it if the car gets totaled or stolen.

Ratulowski claims that he and members of a putative class and subclass were injured when they paid off their car loans early, resulting in PNC obtaining "unearned GAP fees" that PNC did not refund. This practice allegedly violates "Automatic Refund Laws" in six states, which require automatic refunds for unearned GAP fees after an early payoff even when a customer does not request a refund. [DE 26, ¶¶ 1, 10, 12; *see also id.*, ¶¶ 14, 34–35; DE 26-1 (Retail Installment Contract and Security Agreement); DE 26-2 (GAP Waiver Addendum Election Form).][1] The so-called "Automatic Refund States" include Alabama, Colorado, Indiana, Massachusetts, New Jersey, and Texas. *See generally* Ala. Code §§ 8-37-6(b), -2(3); Ala. Admin Code § 155-2-2-.13; 4 Colo. Code Regs.

---

[1] Ratulowski attached two exhibits to the First Amended Complaint [DE 26-1; DE 26-2], copies of which have been re-filed by PNC in support of its pending motions [DE 35-1; DE 35-2]. The latter set of copies are far more legible, and the parties do not dispute that they are the same materials as those submitted in support of the operative complaint. Therefore, I will refer throughout this opinion to the latter set of docket entries when referencing these documents, rather than the less legible copies that are incorporated into the pleadings.

§§ 902-1:8(h), -1:8(l); Ind. Code §§ 24-4.5-2-202(f)(iii), (g), -107; Mass. Gen. Laws 255B § 16; N.J.S. § 17:16BB-6; N.J. Stat. 17:16BB-2; Tex. Fin. Code §§ 354.001(4) 354.007(e). [DE 26, ¶¶ 14, 34.]

As noted at the outset, the complaint asserts claims for breach of contract, "money had and received," and declaratory relief. It also seeks certification of a putative class consisting of persons who entered into finance agreements with GAP addendums in the six Automatic Refund States that were assigned to PNC, as well as certification of a putative subclass of persons who entered such agreements in the State of Indiana that were assigned to PNC. [DE 26, ¶¶ 14, 34, 49–79.]

Here's what happened to Mr. Ratulowski. In December 2015, Ratulowski was looking for a new car and decided to purchase a 2016 Chevrolet Cruze from a dealership in Highland. [*Id.*, ¶ 25; DE 35-1.] He financed the purchase. The terms of the financing were set out in a Retail Installment Contract and Security Agreement expressly "governed by the law of Indiana" and applicable federal laws and regulations. [DE 35-1 at 3.] I will refer to this as his "finance agreement," for short. The finance agreement obligated Ratulowski to repay the full amount financed in 75 monthly installments, starting January 10, 2016, and gave him the option to "prepay this Contract in full or in part at any time." *Id.* at 2–3.

At the same time he financed the purchase of his Chevy Cruze, Ratulowski elected to buy GAP coverage. To that end, the finance agreement listed $506.00 for "GAP Protection" under "insurance premiums paid to insurance company(ies)," and included

4

this amount in the "amount financed" by Ratulowski at the time of purchase. *Id.* at 2.
This agreement was memorialized in a "GAP Waiver Addendum Election Form"
appended to the finance agreement. [DE 26, ¶ 26; DE 35-2.] The GAP Addendum stated
the total amount financed, the interest rate, and installment term, and included a box
(which Ratulowski checked) titled "Yes, I elect the GAP Waiver." [DE 35-2 at 2.] As
described above, the GAP Addendum provides protection to a customer in the event the
vehicle is totaled and an insurance payout does not cover the remaining amount the
customer owes under a finance agreement. By checking the box on the GAP Addendum,
Ratulowski purchased the GAP coverage, meaning that if a total loss of this type
occurred (a "GAP event"), the creditor (ultimately, PNC) would waive the difference
Ratulowski would otherwise owe. [DE 26, ¶¶ 6, 9, 27; DE 35-2 at 2.]

     As addressed in greater detail below, the GAP Addendum contains two express
terms concerning Ratulowski's rights in the event of a "termination" or "cancellation" of
his GAP coverage. That's where the rubber really meets the road in this case. The parties
fiercely dispute the effect of these provisions on Ratulowski's right to an automatic
refund of any "unearned" GAP fees he paid PNC. Frankly, the dispute is understandable
given the relevant language is puzzling, to say the least.

     On one hand, the GAP Addendum contains an express "cancellation" provision.
It says that GAP coverage "*may* be *cancelled* for a full refund within sixty (60) days of the
Origination Date" of the finance agreement, but "in the event of a Total Loss,
Constructive Loss or Unrecovered Theft of the covered Vehicle, the GAP Waiver

Addendum fee will be deemed as fully earned and therefore, no refund will be due."
[DE 35-2 at 3 (emphasis added).] If a customer cancels their GAP coverage more than
sixty days after the origination of the finance agreement, "any refund will be calculated
using a pro-rata method unless otherwise required by state regulatory laws, less a $35
cancellation fee." *Id.* On the other hand, the GAP Addendum also contains an express
"termination" provision: "This GAP Waiver Addendum *will terminate without notice* if
the following occur: (i) when the [finance agreement] terminates; (ii) upon cancellation of
the [finance agreement] prior to its expiration; or (iii) in the event that vehicle listed on
the front of this GAP Waiver Addendum is sold, assigned or transferred by you before
the expiration of the [finance agreement]." *Id.* (emphasis added). The termination
provision says nothing about a refund.

The issue came to a head when Ratulowski (and potentially thousands of others
in the six states with Automatic Refund Laws) paid off the balances on their finance
agreements early. In Ratulowski's case, this occurred in conjunction with the trade-in of
his vehicle. In April 2020, he decided to trade in his Chevy Cruze to a different dealer in
a different state (Gateway Motors in Nebraska). As is customary, Gateway Motors asked
PNC what the payoff amount was. When PNC responded, it included in Ratulowski's
early payoff quote the remaining amount of GAP fees for the full original term of the
finance agreement. He then brought his Chevy Cruze to the dealership and authorized
Gateway Motors to "make the payment to PNC on his behalf." [DE 26, ¶¶ 12, 31–33.]
Upon receipt of the payment from Gateway Motors, Ratulowski authorized PNC to

"transfer title to the vehicle" to the dealer. *Id.* While Gateway Motors made the payments directly to PNC, Ratulowski avers that he "did <u>not</u> transfer or assign his right to a refund of unearned GAP fees to Gateway Motors," and by "making the payment to PNC on [his] behalf, Gateway Motors did not acquire any right to [payment of Ratulowski's] unearned GAP fees." *Id.* (emphasis in original).

What all this means is that Ratulowski unwittingly paid PNC unearned GAP fees in the amount of $156.99, excluding interest. And this occurred because, according to Ratulowski, the payoff number that PNC provided to Gateway Motors was phony. Instead of refunding the unearned GAP fees (or subtracting them from the payoff amount), PNC lumped the unearned GAP fees in with the remaining principal and interest balance, thereby obscuring what was actually owing on the car. *Id.*, ¶¶ 10, 12, 31–33.

For its part, PNC calls my attention to several documents related to the trade-in transaction, including a copy of the "Payoff Quote" it provided Gateway Motors for the Chevy Cruze. [DE 35-3.] A copy of the early payoff statement PNC provided at the time of Ratulowski's trade-in, dated April 1, 2020, reflects a quoted balance of $8,026.56 owing on the finance agreement. *Id.* at 2. The quote appears to have been manually revised at some later date, with handwriting reflecting a balance of [$]8,035.76, dated April 10, 2020. *Id.* In any case, PNC acknowledges that unearned GAP fees were included in the payoff amount. But PNC points out that on April 2, Ratulowski signed a separate "Payoff Authorization" form, which specifically authorized "PNC Bank to accept from

Gateway Motors Incorporated ('Payor') . . . the payoff amount due on my account in the amount of $8,026.56 and surrender to [Gateway Motors] . . . properly endorsed certificate of the above described vehicle." *Id.* at 4.

PNC now seeks dismissal of the complaint on two grounds. First, PNC seeks dismissal for lack of jurisdiction, asserting that because Gateway Motors and not Ratulowski directly sent PNC the check for the early payoff owed on Ratulowski's car, Ratulowski lacks a financial injury-in-fact required for Article III standing. [DE 32 at 11–15.] PNC also argues that the complaint must be dismissed in its entirely for failure to state a claim upon which relief can be granted. In this regard, PNC asserts that the breach of contract claim fails because Ratulowski hasn't alleged that PNC breached any contract provision (express or implied) by not refunding unearned GAP fees; Ratulowski cannot proceed with a "money had and received" claim in light of the parties' express contract; and the claim for declaratory relief is duplicative of the other claims and thus must be dismissed. *Id.* at 16–22. In addition, PNC seeks to cut short Ratulowski's purported class claims at the pleadings, arguing that the allegations make clear that the putative Multi-State Class and Indiana Subclass cannot be certified for a variety of reasons. I will now address each of these arguments in turn.

## Discussion

Before getting into the substance of the matter, let's start with a brief discussion of the applicable standards governing my decision making. PNC seeks dismissal of the First Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of

Civil Procedure. Rule 12(b)(1) requires dismissal if the court lacks subject matter jurisdiction, and Rule 12(b)(6) permits a party to move for dismissal if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(1), 12(b)(6).

To avoid dismissal under Rule 12(b)(6), a claim for relief must be "plausible on its face." *Proft v. Raoul*, 944 F.3d 686, 690 (7th Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility requires the plaintiff to plead sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Taha v. Int'l Brotherhood of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Seventh Circuit has explained that the plaintiff must plead facts that "suggest a right to relief that is beyond the speculative level," which requires alleging "enough details about the subject-matter of the case to present a story that holds together." *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

A party may seek dismissal for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). Fed. R. Civ. P. 12(b)(1). Courts distinguish between "facial" and "factual" challenges to subject matter jurisdiction. *Apex Dig., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443–45 (7th Cir. 2009). In a "facial" challenge, the defendant "argues that the plaintiff has not sufficiently '*alleged* a basis of subject matter jurisdiction,'" *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (citing *Apex Dig.*, 572 F.3d at 443–44), and I apply the same plausibility standard applicable to a Rule 12(b)(6) motion to dismiss. *Id.* at 174.

By contrast, a "factual challenge" asserts that "'there is *in fact* no subject matter jurisdiction,' even if the pleadings are formally sufficient." *Id.* at 173 (citing *Apex Dig.*, 572 F.3d at 444). In the context of a factual challenge, I may "look beyond the pleadings and view any evidence submitted to determine if subject matter jurisdiction exists." *See id.* To survive dismissal, the plaintiff must "come forward with 'competent proof'" establishing jurisdiction "by a preponderance of the evidence." *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003) (quoting *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996)).

**Motion to Dismiss**

### I.      Article III Standing

Federal courts are courts of limited subject matter jurisdiction. This jurisdiction only extends to "Cases" and "Controversies." U.S. Const. art. III, § 2; *Johnson v. U.S. Office of Pers. Mgmt.*, 783 F.3d 655, 660 (7th Cir. 2015). Recognizing this, federal courts have developed various doctrines of justiciability. These rules collectively establish "the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary." *Allen v. Wright*, 468 U.S. 737, 750 (1984) (internal quotation and citation omitted), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). One such doctrine—the "irreducible constitutional minimum of standing"—is derived from Article III's express limitation of federal judicial power to "Cases" and "Controversies" and the "separation-of-powers principles underlying that limitation." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014)

10

(quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

To have standing to proceed in federal court, Ratulowski must demonstrate "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan*, 504 U.S. at 560–61); *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020). Financial injury in the "form of an overcharge" to the plaintiff personally can support Article III standing. *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 694–95 (7th Cir. 2015) (citing *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 751 (7th Cir. 2011) ("The plaintiffs' loss is financial: they paid more for the toys than they would have, had they known of the risks the beads posed to children. A financial injury creates standing.")). Here, Ratulowski alleges a monetary loss in the $156.99 in GAP fees that PNC pocketed but did not earn.

As a threshold matter, the parties dispute whether PNC is raising a factual or facial challenge to subject matter jurisdiction. [DE 44 at 11–12; DE 47 at 7.] I construe this challenge as a factual attack on Ratulowski's standing, because PNC submits information beyond the pleadings, including several trade-in documents not incorporated into the pleadings, which challenge the "facts underlying the allegations" in the First Amended Complaint—namely, whether Ratulowski "paid off" his finance agreement early. *Bazile*, 983 F.3d at 279. [*See* DE 35-3 at 2–4.] I also note that Ratulowski, in his opposition, relies upon evidence outside of the pleadings to support his argument

on standing, which reinforces this view. [DE 46-4 (Ratulowski Decl.) & Ex. 1; *see* DE 44 at 9–10, 12–14.]  Where a party's allegations supporting standing "are questioned as a factual matter—either by a party or the court—the plaintiff must support each controverted element of standing with 'competent proof.'"  The Seventh Circuit has held that this requires "a showing by a preponderance of the evidence, or proof to a reasonable probability, that standing exists." *Bazile*, 983 F.3d at 278 (quoting *Retired Chi. Police Ass'n v. City of Chi.*, 76 F.3d 856, 862 (7th Cir. 1996); *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)).

PNC focuses its argument in large part on evidence that Gateway Motors, and not Ratulowski, directly paid PNC the early payoff owing on the Chevy Cruze. [DE 32 at 12–15.] PNC points me to Indiana case law standing for the proposition that legal title to a vehicle transfers to a dealer when the car is entrusted and transferred to the dealer. *See Madrid v. Bloomington Auto Co.*, 782 N.E.2d 386, 397 (Ind. Ct. App. 2003). So, when Ratulowski dropped his car off at the dealership in Nebraska and signed the authorization form directing PNC to release the title to the car in exchange for the early payoff check mailed to PNC, Gateway Motors had already obtained legal title to the vehicle *before* it made the early payoff to PNC. It follows, the argument goes, that at the point in time a refund was allegedly owing under the GAP Addendum (*i.e.*, when the early payoff was made), Ratulowski had already relinquished title to and thus washed his hands of any legal rights and obligations in connection with his old Chevy Cruze. PNC argues that if there is a proper plaintiff for this contract claim, it may be the dealer

that obtained title to the vehicle. If Ratulowski has a beef, he should take it up with the dealer—who somehow (it's not clear precisely how) should have known that Ratulowski owed less than PNC quoted on the balance of the finance agreement, and thus given him a better deal at trade-in.

This line of argument is (frankly) a little hard to swallow, and is, at the very least, highly formalistic. It seems to ignore the reality of what took place in the trade-in transaction: rather than two separate deals (one between Ratulowski and the Nebraska dealer, immediately followed by another deal between the dealer and PNC), his authorization for the dealer to make payment to PNC was part of a single process in which the balance of the finance agreement was paid off with Ratulowski's money.

It is true that the GAP Addendum states that GAP coverage "terminates" when the finance agreement is cancelled. But it does not speak in any way to *how* it is cancelled. What's more, it's pretty obvious that everyone involved in the trade-in understood that it was Ratulowski's money (whether borrowed or paid up-front) that was ultimately funding the early payoff of his finance agreement. Ratulowski has specifically alleged (and now sworn in an affidavit) that: (i) PNC quoted the amount due on his finance agreement to include GAP fees that were obviously not earned since they covered periods after the cancellation and/or termination of the GAP Addendum; (ii) he was unaware at the time of the early payoff of his finance agreement that PNC's early payoff quote included unearned GAP fees; (iii) he financed the remaining amount needed to pay off his finance agreement with PNC, including the portion of the early

payoff encompassing the unearned GAP fees, at the time of the trade-in; and (iv) he authorized Gateway Motors to send "the payment to PNC [on his] behalf" to pay off the finance agreement early with "[his] money," including the portion of "unearned" GAP fees that PNC had quoted. [DE 26, ¶¶ 31–33, 55; Ratulowski Decl., ¶¶ 3–6 & Ex. 1.]

PNC, for its part, relies almost entirely on its Payoff Quote and Ratulowski's Payoff Authorization to make the case that Ratulowski was not financially harmed in a manner traceable to its conduct, but rather the dealer's subterfuge in negotiating the value of his old car at trade-in. [DE 35-3 at 2–4.] The argument is nonsensical. If one believes what is in the complaint, PNC's Payoff Quote included GAP fees that it had not earned and was not entitled to. What's more, the Payoff Quote from PNC was not itemized, so it's quite a stretch to infer that Gateway Motors should (or even could) have known that PNC was including in the quote GAP fees that PNC was not entitled to receive. Ratulowski's Payoff Authorization simply says that he authorized PNC to accept a check from Gateway Motors in the amount of the balance listed on the Payoff Quote. In short, it is reasonable to infer that Gateway Motors was making the payment as Ratulowski specifically alleged in his complaint—on his behalf, but without his knowledge that the payment covered not only the balance due on the car, but also GAP fees that were unearned.

Under these circumstances, a reasonable person in Ratulowski's shoes might assume one of two things: either PNC had deducted the unearned GAP fees from the payoff amount such that he was made whole in that manner with a credit; or second,

that the payoff quote from PNC only included the remaining balance on the car itself

and that PNC would cut him a check (minus the $35 handling fee) for the unearned GAP

fees. But alas, Ratulowski would be wrong; PNC pocketed the money instead.

In view of the foregoing considerations, I find that the evidence reflects a

"reasonable probability" that Ratulowski was harmed financially by PNC when he

authorized Gateway Motors to send *his money*, whether borrowed or paid up-front, on

*his behalf* to PNC to pay off the finance agreement early. *See Bazile*, 983 F.3d at 278. This

early payoff created a concrete financial injury to Ratulowski personally that was

traceable to PNC's allegedly overstated Payoff Quote, resulting in an overpayment to

PNC of approximately $157 in unearned GAP fees that PNC has not refunded. [*See*

DE 26, ¶¶ 31–33, 55; Ratulowski Decl., ¶ 7.] Thus, Ratulowski has established the type of

financial injury required to confer Article III standing to proceed on his contract claim.

## II.    Breach of Contract (Count I)

The elements of breach of contract under Indiana law include the existence of a

contract, the defendant's breach, and damages. *Berg v. Berg*, 170 N.E.3d 224, 231

(Ind. 2021) (quoting *Fowler v. Campbell*, 612 N.E.2d 596, 600 (Ind. Ct. App. 1993)). PNC

takes issue with the second element, arguing that the complaint fails to plausibly allege

PNC's breach of any implied or express term of the parties' written agreements by

failing to automatically refund unearned GAP fees after Ratulowski made an early

payoff on his finance agreement. Taking Ratulowski's lead, I will first address the

parties' arguments pertaining to an implied term in the GAP Addendum imposed by

Indiana law, before considering whether Ratulowski has plausibly alleged a breach of the express terms of the GAP Addendum.

### A.    Implied Term Under Indiana's Automatic Refund Law

Initially, Ratulowski asserts PNC breached an implied term in the parties' written agreements imposed by what he broadly terms Indiana's Automatic Refund Law." PNC's rejoinder is that no provision in Indiana law in place at the time the contract was entered required the automatic refund of unearned GAP fees.

Recall that Ratulowski executed his finance agreement and GAP Addendum (both of which are governed by Indiana law) in 2015. Curiously, the First Amended Complaint cites to an Indiana statute governing GAP agreements that passed into law in *2018*—three years later. [DE 26, ¶ 14(c); *see also id.*, ¶¶ 61–62, 69.] In July 2018, the General Assembly amended then-existing law to provide (in no uncertain terms) that "the seller of the GAP agreement" must "issue a refund" upon the termination of a GAP agreement or upon early prepayment. Ind. Code §§ 24-4.5-2-202(4)(f), (g). The law further defines "seller" to include a seller's "assignee," such as PNC here. *Id.* § 24-4.5-2-107. While it is true that courts generally presume parties understand and wish to comply with laws in existence at the time they enter a contract, *see In re Doctors Hosp. of Hyde Park, Inc.*, 337 F.3d 951, 959 (7th Cir. 2003); *Town of New Ross v. Ferretti*, 815 N.E.2d 162, 167 (Ind. Ct. App. 2004), the same is not true for laws enacted *after* the execution of an agreement but prior to a contract's termination or expiration. Ratulowski has not presented any authority to the contrary. Therefore, I conclude the 2018 amendments to

the statute specifically regulating refunds upon the termination of a GAP agreement or early prepayment of an auto finance agreement do not form a basis for Ratulowski to claim that PNC breached an implied term of the finance agreement and GAP Addendum.

Ratulowski urges me to look farther back in time to find an implied automatic refund term imposed by Indiana law at the time he executed the finance agreement and GAP Addendum. In 2015, Chapter 2 of the state's Uniform Consumer Credit Code regulated "consumer credit sales," but made no specific mention of GAP agreements. *See* Ind. Code § 24-4.5-1-301.5(8). Section 201 defined the "credit service charge" that may be included in such sales, and Section 202 defined the types of additional charges that may be included. *Id.* §§ 24-4.5-2-201, 202. Under Section 202, fees for GAP products in connection with a consumer credit sale were permitted to the extent "reasonable in relation to the benefits." *Id.* § 24-4.5-2-202(1)(c). The 2015 law further imposed a requirement that creditors submit "supporting documents" to the state's Department of Financial Institutions to demonstrate that a charge for covered products offered in connection with a consumer credit sale was "reasonable in relation to the benefits." *Id.*

None of these provisions create an explicit automatic refund obligation, in contrast to the 2018 amendments. Rather than relying on the language of the statutes in place in 2015, Ratulowski focuses on informal guidance pertaining to GAP agreements published by the Indiana Department of Financial Institutions. [*See* DE 44 at 15–18; DE 46 (Sims Decl.); DE 46-1.] These documents last appear to have been edited in late 2015

and can be publicly located on an Indiana government website but have no clear

publication date. [DE 46-1; *see* Sims Decl., ¶ 2.]

PNC responds that these informal documents have not been enacted as formal

agency rules pursuant to the Indiana Administrative Rules and Procedures Act (ARPA),

and thus are void and do not have the force or effect of law. [DE 47 at 14–15.] *See* Ind.

Code §§ 4-22-2 *et seq.* ARPA defines a "rule" to include "the whole or part of an agency

statement of general applicability that: (1) has or is designated to have the effect of law;

and (2) implements, interprets or prescribes: (A) law or policy; or (B) the organization,

procedure, or practice requirements of an agency." *Id.* § 4-22-2-3(b). ARPA does not

apply to actions that do "not have the effect of law" and "relate[] solely to internal

policy, internal agency organization, or internal procedure." *Id.* § 4-22-2-13(c)(1). In the

context of rulemaking, ARPA imposes on agencies specific requirements, like publishing

notice of a proposed rule; conducting a public hearing; formally adopting the rule; and

obtaining approvals from state executives. *See id.* §§ 4-22-2-23 *et seq.*

State courts have clarified that rules, as opposed to administrative orders, are

designed to apply generally and operate prospectively. *See Indianapolis Downs, LLC v.

Indiana Horse Racing Comm'n*, 827 N.E.2d 162, 168 (Ind. Ct. App. 2005) (citing *Miller

Brewing Co. v. Bartholemew County Beverage Co.*, 674 N.E.2d 193, 202 (Ind. Ct. App. 1996)).

An agency "may only regulate by a new rule if the proper rulemaking procedures have

been followed." *Villegas v. Silverman*, 832 N.E.2d 598, 608 (Ind. Ct. App. 2005). Where

rules are not promulgated in compliance with ARPA, "they are void and without effect."

*Id.* at 610. In *Villegas*, for example, the court evaluated documentation requirements for obtaining driver's licenses and identification cards published by the Bureau of Motor Vehicles. The court juxtaposed these rules—external requirements of general applicability to all who sought driver's licences or ID cards—with cases in which agencies had promulgated internal policies—for example, a policy concerning parole officers' home visits with parolees, which primarily affected agency employees' work hours. *Id.* at 609–10 (evaluating *Conquest v. State Employee's Appeals Comm'n*, 565 N.E.2d 1086, 1088 (Ind. Ct. App. 1991)). Since the new requirements were rules and the agency did not comply with ARPA, the rules were void and plaintiffs were entitled to summary judgment on their claims challenging the new requirements. *Id.* at 610.

Turning back to the agency documents at issue in this case, Ratulowski asserts that in 2015, the Department of Financial Institutions published "specific requirements for all GAP addendums" in a statement titled "RE: Guaranteed Auto/Asset Protection (GAP) - Program Approval Application." [*See* DE 44 at 15; DE 46-1 at 2, 6–8.] The document states that pursuant to Indiana Code §§ 24-4.5-2-202(1)(c) and -3-202(1)(e), "[a]ll GAP programs offered to Indiana consumers must first be approved by the Indiana Department of Financial Institutions." [DE 46-1 at 2.] DFI then provided guidance on such applications for GAP agreements. *Id.* at 6–8. In a section titled "Standardized GAP Agreements," DFI "advis[ed] all GAP administrators that consumer GAP agreements used in Indiana must include" certain "standardized information," including information about obtaining an automatic refund of unearned GAP fees. *Id.* at

19

6–7. DFI also published an "INDIANA Endorsement" to a standard GAP Waiver Agreement, which basically looks like a model creditors could incorporate into their GAP addendums. It states that "in the event the finance contract is terminated early, the assignee lender is obligated to automatically refund the GAP cost according to the cancellation provisions of the GAP Waiver Agreement. There is no obligation on the part of you (the consumer) to request this refund." *Id.* at 8.

From one angle, these materials look like informal guidance to prospective applicants under Indiana Code §§ 24-4.5-2-202(1)(c) and -3-202(1)(e). Of course, to the extent these materials were published informally, they are not rules that carry "the effect of law," such that they would create an implied term in the parties' GAP Addendum. *See* Ind. Code § 4-22-2-13(c)(1). If, instead, these materials are properly construed as the Department of Financial Institutions' formal statement of policy applicable to all GAP agreements offered in Indiana under the 2015 vintage of the Uniform Consumer Credit Code, the parties do not dispute that they were not promulgated under ARPA's rulemaking requirements. It strikes me as a major stretch to sidestep ARPA's detailed rulemaking process. The underlying statute simply provides that DFI "shall determine whether the charge would be of benefit to the consumer and is reasonable in relation to the benefits." *See* Ind. Code § 24-4.5-2-202(1)(c). In either case, I find these documents do not establish a basis in law to impose an implied term in Ratulowski's finance agreement and GAP Addendum and thus cannot form a basis for PNC's alleged breach of contract.

### B.   Express Terms of the GAP Addendum

Let's shift gears to the more difficult issue in the case—the express terms of the parties' agreements and what they might mean. Ratulowski claims that PNC breached the parties' agreements by failing to automatically refund the GAP fees he paid under the GAP Addendum's cancellation and termination provisions. [DE 26, ¶¶ 10, 31–33, 55.] To reiterate, the "cancellation" provision in the GAP Addendum states that GAP coverage "may be cancelled for a full refund within sixty (60) days of the Origination Date" of the finance agreement, but "in the event of a Total Loss, Constructive Loss or Unrecovered Theft of the covered Vehicle, the GAP Waiver Addendum fee will be deemed as fully earned and therefore, no refund will be due." [DE 35-2 at 3.] If a customer cancels their GAP coverage more than sixty days after the origination of the finance agreement, "any refund will be calculated using a pro-rata method unless otherwise required by state regulatory laws, less a $35 cancellation fee." *Id.* The cancellation provision is silent as to the form of notice required. Separate and apart, the contract's "termination" provision provides: "This GAP Waiver Addendum *will terminate without notice* if the following occur: (i) when the [finance agreement] terminates; (ii) upon cancellation of the [finance agreement] prior to its expiration; or (iii) in the event that vehicle listed on the front of this GAP Waiver Addendum is sold, assigned or transferred by you before the expiration of the [finance agreement]." *Id.* (emphasis added). The termination provision says nothing about a refund.

I have read the GAP Addendum "cancellation" and "termination" provisions

21

many times over and they have left me with more questions than answers. Here's how I

see it: The first and third termination conditions state that the GAP Addendum

automatically terminates (*i.e.*, "without notice") if Ratulowski's finance agreement

terminates (*i.e.*, he paid off the full balance specified in the agreement), or if he sells,

assigns, or transfers the vehicle to someone else before the agreement expires. The terms

"terminates" and "expiration" are not defined in the agreement. That said, the two

conditions use the terms distinctly, suggesting there is some difference between when

the finance agreement "expires" and "terminates." My best guess is that when a

customer pays off their finance agreement before the full installment term "expires," that

early payoff "terminates" the finance agreement without notice; but if the customer pays

each monthly installment over the period stipulated in the finance agreement, it

"expires" upon receipt of the final payment. But that's not clearly delineated in the

agreement.

        The second condition triggering an automatic "termination" of the GAP

Addendum is even more confusing. It says that GAP coverage will automatically

terminate "upon *cancellation* of the [*finance agreement*] prior to its expiration"—not to be

confused with cancellation of the *GAP Addendum*, per the cancellation provision

previously discussed. This provision appears to contemplate a scenario in which GAP

coverage would automatically terminate if a customer cancels the finance agreement,

distinct from the GAP Addendum, before the finance agreement expires. Yet it's entirely

unclear to me (a) how a customer would seek only to cancel the finance agreement, but

not also the GAP Addendum appended to the finance agreement, and (b) whether a simultaneous "cancellation" of the GAP Addendum and finance agreement would entitle a customer to a pro-rata refund (considering cancellation of the finance agreement prior to its expiration triggers an automatic "termination" of GAP coverage). In other words, is a customer like Ratulowski required to use certain (unspecified) language to accomplish cancellation of only the finance agreement (triggering automatic termination of the GAP Addendum)? Is it enough to simply send a check to PNC for the balance due on his loan? If he had called up PNC to "cancel" his finance agreement and made no mention of the GAP coverage, would that trigger an automatic termination of the GAP coverage—even though he expressly requested a "cancellation" of his agreement, which he could reasonably believe included the associated GAP coverage, prior to its expiration? As I said above, the contract leaves me with many more questions than answers.

Where a contract is ambiguous, courts "look to a few general principles of contract interpretation to resolve the ambiguity." A common refrain is that "the ambiguity should be resolved against the drafters of the contract." *Crescent Corp. v. Proctor & Gamble Co.*, 898 F.2d 581, 584 (7th Cir. 1990) (citing *Turnpaugh v. Wolf*, 482 N.E.2d 506, 509 (Ind. Ct. App. 1985)); *see also Vesuvius USA Corp. v. Am. Comm. Lines LLC*, 910 F.3d 331, 333 (7th Cir. 2018); *Trinity Homes, LLC v. Fang*, 848 N.E.2d 1065, 1068 (Ind. 2006). This rule applies equally to assignees of drafters, like PNC here. *See, e.g., F.D.I.C. v. Univ. Anclote, Inc.*, 764 F.2d 804, 806 (11th Cir. 1985).

23

PNC urges me to find the GAP Addendum unambiguously requires a "cancellation" triggering a pro-rata refund only in the event Ratulowski "affirmatively cancel[led] the GAP product." [*See* DE 47 at 12 (citing DE 46-4).] In my view, the relevant language is clear as mud, as far as an "automatic refund" of GAP fees is concerned. The agreement generally states that GAP coverage "*may* be *cancelled*," and is silent as to the form of notice required. [DE 35-2 at 3 (emphasis added).] Nothing in the contract explicitly requires a customer to submit a formal notice of cancellation of GAP coverage (distinct from cancellation of the finance agreement) to trigger a pro-rata refund. At the same time, it's clear that if a cancellation occurs after the initial sixty days following origination of the finance agreement, PNC is obligated to refund fees pro-rata, less a $35 fee. Although it seems that an early payment of the finance agreement could simultaneously trigger a termination of GAP coverage, the interplay between the provisions is unclear on the face of the contract.

It would be inappropriate to foreclose Ratulowski's claims based on this ambiguity. *See Crescent Corp.*, 898 F.2d at 584 (citing *Colonial Mortgage of Indiana, Inc. v. Windmiller*, 376 N.E.2d 529, 532 (Ind. Ct. App. 1978); *Tidd v. Stauffer*, 308 N.E.2d 415, 417 (Ind. Ct. App. 1974)). In light of the ambiguous language in the cancellation and termination provisions, which must be construed against PNC, Ratulowski will be permitted to proceed on his claim that PNC breached the express terms of the GAP Addendum when it failed to automatically refund the GAP fees he paid as part of his early payment of his finance agreement.

24

Before moving to the balance of the claims, I will note that I am not the first to parse similar language in GAP agreements. Ratulowski's case is another in a series of actions against auto finance companies alleging widespread practices of withholding GAP fees that should be refunded to customers automatically upon early payment or cancellation. In *Herrera v. Wells Fargo Bank, N.A.*, Judge Selna of the Central District of California parsed language in a handful of analogous contracts and evaluated whether the final payoff of a finance agreement was sufficient to trigger Wells Fargo's obligation to refund unearned GAP fees. *See* No. SACV18332JVSMRWX, 2020 WL 5802421 (C.D. Cal. Sept. 1, 2020). In *Herrera*, the court highlighted language in certain plaintiffs' agreements that did not include any requirement that a customer submit a written refund request to trigger a pro-rata refund of GAP fees. *Id.* at *4–5 (discussing plaintiffs Jones' and Sweeney's contracts). One of the contracts specified that a customer must give "[n]otice of early termination" to obtain a pro-rata refund, but stated that notice "may"—not "must"—be given. Termination would occur on "the date the Financing Contract is prepaid." The court concluded that providing "notice," let alone a written refund request, was not a condition precedent to receiving a refund when the customer prepaid his finance agreement. *Id.* at *4.

While not a directly on point with the language at issue in this case, the analysis in *Herrera* is at least directionally consistent with my conclusion that the GAP Addendum is ambiguous. Similar to the case at hand, the contract's permissive language and lack of an explicit requirement that a customer provide a written refund request to

obtain a refund of GAP fees creates an ambiguity as to whether early payment of the finance agreement triggers the assignee's refund obligation.

PNC brings to my attention a case decided last year by Judge Blakey of the Northern District of Illinois. [DE 51-1.] There, the relevant cancellation language in the GAP agreement specifically required a customer to "provide written notice of . . . cancellation or early termination of Your loan to the Administrator, Us, or the Lienholder within ninety (90) days after Your decision to cancel or the occurrence of the event causing the early termination of loan," and provided for a pro-rata refund of GAP fees. *See Jones v. PNC Bank, N.A.*, No. 1:21-CV-02000, 2022 WL 4465901, at *2 (N.D. Ill. Sept. 26, 2022). PNC moved to dismiss the plaintiff's breach of contract claim because her written check for the prepayment of the balance on her finance agreement did not satisfy these notice provisions. *Id.* The court found the contract claim untimely and did not address PNC's argument that early prepayment of the finance agreement did not satisfy the notice provision in the cancellation agreement. *Id.* at *4–6. So, this case is not really helpful for present purposes.

In sum, it is plausible that, as Ratulowski alleges, the authorization of his early payoff to PNC cancelled his GAP coverage, entitling him to a pro-rata refund of any unearned GAP fees. Ratulowski will be permitted to proceed with his breach of contract claim based on the express terms of the finance agreement and GAP Addendum.

### III.    Money Had and Received (Count II)

Ratulowski pleads his "money had and received" claim in the alternative to his

breach of contract claim. [DE 26, ¶ 74; DE 44 at 22.] Under Indiana law, "money had and received" is an "equitable remedy" in the nature of unjust enrichment and is available when the defendant

> has received money either from the plaintiff himself or third persons, under such circumstances that in equity and good conscience he ought not to retain the same, and which money, *ex aequo et bono*, belongs to the plaintiff, and where money has been received by mistake of facts, or *without consideration*, or upon a consideration that has failed, it may be recovered back

*T-3 Martinsville, LLC v. US Holding, LLC*, 911 N.E.2d 100, 122 (Ind. Ct. App.) (quoting *Pufahl v. Nat'l Bank of Logansport*, 154 N.E.2d 119, 120–21 (Ind. Ct. App. 1958) (emphasis in original)). The Indiana Court of Appeals has held that "the existence of an express contract precludes recovery on the equitable theory of money had and received." *Id.* at 123 (quoting *Shelby Eng'g., Inc. v. Action Steel Supply, Inc.*, 707 N.E.2d 1026, 1028 (Ind. Ct. App. 1999)). For example, the court in *T-3 Martinsville*, observing the parties had an express contract, held that the plaintiff was precluded from recovering under a theory of unjust enrichment and affirmed summary judgment for the defendant on the claim. *Id.* at 123–24 (citing *City of Indianapolis v. Twin Lakes Enterprises, Inc.*, 568 N.E.2d 1073, 1079 (Ind. Ct. App. 1991)).

Ratulowski has pleaded the existence of an express contract and will be permitted to proceed with his contract claim. Consequently, he is precluded from proceeding on his parallel equitable claim. *Accord Page v. Alliant Credit Union*, No. 19-CV-5965, 2021 WL 1688176, at *3 (N.D. Ill. Apr. 29, 2021). Ratulowski cites authority for the proposition that he can maintain this claim, despite the existence of an express

contract between the parties, because the contract "contains a provision . . . which is prohibited by Indiana law." *See Lawson v. First Union Mortg. Co.*, 786 N.E.2d 279, 284 (Ind. Ct. App. 2003). But as I have already explained, Indiana law in place at the time Ratulowski executed his auto finance agreements did not require an automatic refund of GAP fees. Accordingly, Count II will be dismissed.

### IV.   Declaratory Relief (Count III)

Ratulowski's final claim for relief seeks declaratory judgment that (a) PNC took over the contractual obligation to pay the refund of unearned GAP fees to a customer to the extent a refund is owed under the GAP Addendum at issue in this case, and (b) PNC is required to pay interest on any unearned GAP fees that it collects when the finance agreement has been paid off early and that it subsequently fails to refund within a reasonable time period. [DE 26, ¶ 76.]

The Declaratory Judgment Act states that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Seventh Circuit has explained that even where such a claim is within the court's jurisdiction, "the federal courts have discretion to decline to hear [it]." *Tempco Elec. Heater Corp. v. Omega Engineering, Inc.*, 819 F.2d 746, 747 (7th Cir. 1987). Courts in this circuit have so exercised discretion where declaratory judgment claims are duplicative of breach of contract claims. *See, e.g.*, *Couch v. Wilco Life Ins. Co.*, 363 F.

Supp. 3d 886, 902 (S.D. Ind. 2019); *Cliffs Mining Co. v. Wisconsin Electric Power Co.*, 2018

WL 6181470, *7 (E.D. Wis. 2018); *Hess v. Biomet, Inc.*, 2017 WL 661511, *12 (N.D. Ind.

2017); *Sweet v. Indianapolis Jet Center, Inc.*, 918 F. Supp. 2d 801, 804 (S.D. Ind. 2013).

Like the breach of contract claim, Count III requests a declaration that PNC is

obligated to pay the refund of GAP fees "under the GAP agreements at issue in this

lawsuit," plus interest. [DE 26, ¶ 76.] Ratulowski further avers that it is "potentially

possible that these issues may not be resolved with the breach of contract claim in the

event that PNC prevails on its other defenses to that claim," and that a declaration that

PNC unlawfully refuses to refund unearned GAP fees will benefit him, members of the

proposed class, and the general public, even if PNC defeats his contract claim. *Id.*, ¶ 78.

As I have already explained, to the extent no refund is owed under the parties' contract,

PNC would not be obligated to pay a refund to Ratulowski, so no such declaration

would be warranted. Therefore, Count III will be dismissed as duplicative of Count I.

*See Couch*, 363 F. Supp. 3d at 903.

### Motion to Strike

PNC seeks to strike the class allegations. Rule 23(a) of the Federal Rules of Civil

Procedure provides an action may be certified as a class action if:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class; (3) the claims or
> defenses of the representative parties are typical of the claims or defenses
> of the class; and (4) the representative parties will fairly and adequately
> protect the interests of the class.

There are two other requirements at class certification: "questions of law or fact

common to class members predominate over any questions affecting only individual members," and that "a class action is superior" to other methods of adjudication. Fed. R. Civ. P. 23(b)(3). Rule 23(c)(1)(A) requires courts to determine whether to certify an action as a class action "[a]t an early practicable time" in the case, and Rule 23(d)(1)(D) permits courts to enter orders that "require the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly."

Before the plaintiff seeks to certify a class, the defendant may file a motion under Rule 12(f) to "'strike class allegations at the pleading stage when they are facially and inherently deficient,' particularly when the dispute is not factual and discovery is unnecessary to resolve it." *Miles v. Am. Honda Mot. Co., Inc.*, No. 17-C-4423, 2017 WL 4742193, at *5 (N.D. Ill. Oct. 19, 2017) (quoting *Cholly v. Uptain Group, Inc.*, No. 15 C 5030, 2015 WL 9315557, *3 (N.D. Ill. Dec. 22, 2015)); *see also Huddleston v. Am. Airlines*, Inc., No. 16-CV-09100, 2018 WL 4742097, at *2 (N.D. Ill. Oct. 2, 2018).

The present motion has a cart-before-the-horse feel to it. And, indeed, a number of district courts in this circuit have observed that motions to strike class allegations are "generally disfavored and fall under the purview of Rule 23 rather than Rule 12(f)." *Beyer v. Michels Corp.*, No. 21-CV-514-PP, 2023 WL 2693439, at *12 (E.D. Wis. Mar. 29, 2023) (collecting cases); *see also Womick v. Kroger Co.*, No. 21-CV-00574-NJR, 2022 WL 1266630, at *2 (S.D. Ill. Apr. 28, 2022) ("District courts within the Seventh Circuit evaluate motions to strike class allegations under Rule 23, not Rule 12(f)." (internal

quotation omitted)).

While there has been some disagreement among the lower courts as to which party bears the burden "when the propriety of class certification is raised by means of a motion to strike class allegations," more recent cases in this circuit have coalesced on the position that "where the plaintiffs have not yet had the benefit of class discovery, the defendant 'bears the burden of proving that the proposed class is not certifiable.'" *Womick*,  2022 WL 1266630, at *2 (quoting *Kurt v. Platinum Supplemental Ins., Inc.*, 2021 WL 3109667, at *13 (N.D. Ill. July 22, 2021)) (collecting cases); *see also Beyer*, 2023 WL 2693439, at *12. Additionally, where "the dispute concerning class certification is factual in nature and discovery is needed to determine whether a class should be certified . . . a motion to strike the class allegations at the pleading stage is premature." *Harris v. Rust-Oleum Corp.*, No. 21-CV-01376, 2022 WL 952743, at *3 (N.D. Ill. Mar. 30, 2022) (quoting *Buonomo v. Optimum Outcomes, Inc.*, 301 F.R.D. 292, 295 (N.D. Ill. 2014)).

Ratulowski seeks to assert claims on behalf of a Multi-State Class consisting of:

> All persons (1) who entered into finance agreements with GAP addendums in an Automatic Refund State that were assigned to PNC; (2) who paid off their finance agreements before the end of the contract term during the time period that the applicable Automatic Refund Law was in effect; and (3) who did not receive a credit or refund of the unearned GAP fees and/or the accrued interest on those unpaid amounts. The class period is based on the applicable statutes of limitations in each of the Automatic Refund States.

[DE 26, ¶ 34; *see also id.*, ¶ 14.] He further seeks to assert claims on behalf of an Indiana Subclass consisting of:

> All persons (1) who entered into finance agreements with GAP

addendums in the State of Indiana that were assigned to PNC; (2) who paid off their finance agreements before the end of the contract term during the time period that an Automatic Refund Law was in effect; and (3) who did not receive a credit or refund of the unearned GAP fees and/or the accrued interest on those unpaid amounts. The class period is based on the applicable statutes of limitations in Indiana.

*Id.*, ¶ 35. In sum, the putative Multi-State Class and Indiana Subclass are defined to include only those individuals who entered finance agreements with GAP addendums in an Automatic Refund State, and who paid off their finance agreement early during the time period that the applicable Automatic Refund Law was in effect. *Id.*, ¶¶ 34–35.

PNC has presented numerous arguments for why the putative classes cannot be certified due to individualized inquiries into class members' standing, varying material terms in class members' contracts (*i.e.*, arbitration and class waiver clauses; materially different cancellation and termination terms), material differences in the Automatic Refund Laws in the six states asserted as part of the Multi-State Class, and manageability concerns based on the potential need to join dealers and GAP administrators to the action in order to resolve class members' claims. [*See* DE 34; *see also* DE 48.] Ratulowski responds to each in turn, arguing that standing is not a substantial defense to his claims, any potential differences in the material terms of class members' agreements are manageable by narrowing the class definition at class certification and thus will not cause individual issues to predominate, it is premature to strike the allegations pertaining to non-Indiana customers, and the dealers and GAP administrators are not proper parties to this lawsuit because they do not owe any direct contractual obligations to class members. [*See* DE 45.]

Importantly (and oddly), any individual whose "finance agreement with a GAP addendum was entered into *before the applicable Automatic Refund Law went into effect*" is specifically "[e]xcluded from the proposed *Class*." [DE 26, ¶ 36 (emphasis added).] It's hard to parse whether this limitation only applies to the Multi-State Class, or both the Multi-State Class and Subclass. The complaint seems to differentiate between the two by using "Class" as shorthand for the Multi-State Class. *See id.*, ¶¶ 34–36.

But logically, the limitation is applicable to both proposed classes. As previously explained, in order for Ratulowski to assert a contract claim based on an implied term imposed by Indiana's Automatic Refund Law, that law must have been in place at the time he entered into his contracts. In other words, to the extent Ratulowski's "finance agreement with a GAP addendum was entered into before the applicable Automatic Refund Law went into effect," *see id.*, ¶¶ 35–36, he cannot assert a contract claim on behalf of "similarly aggrieved" Indiana customers based on an 'implied terms' theory. In light of this, I construe the limitation in paragraph 36 of the complaint as applicable to both the Multi-State Class and Subclass.[2]

A fundamental requirement for class certification is that an identifiable class

_____

[2] I will further note that the Multi-State Class and Indiana Subclass are limited to individuals who *paid off* finance agreements before the end of their contract terms "during the time period that an Automatic Refund Law was in effect." *See id.*, ¶¶ 34–35. This is confusing, because it muddles the connection between the Automatic Refund Laws and PNC's legal obligations under class members' contracts. What really matters is whether the Automatic Refund Law was in effect when a customer *entered into* their finance agreement and purchased GAP coverage. Under Ratulowski's 'implied term' theory, that's what creates the obligation for PNC to automatically refund unearned GAP fees, to the extent not required under the express terms of the class members' contracts. As discussed above, Ratulowski paid off his finance agreement early in 2020, but he cannot rely on an implied automatic refund term allegedly imposed in his finance agreement and GAP Addendum, because he entered the agreements in 2015, three years prior to the Automatic Refund Law coming into effect.

exists to certify and that the named plaintiff's claim is typical of those of the class. *See, e.g., Cavin v. Home Loan Ctr., Inc.*, 236 F.R.D. 387, 392 (N.D. Ill. 2006). In order to have standing to proceed as a class representative, "it is essential that a plaintiff must be part of that class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." *Keele v. Wexler*, 149 F.3d 589, 593 (7th Cir. 1998) (quoting *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 216 (1974)); *see also Culver v. City of Milwaukee*, 202 F.3d 272 (7th Cir. 1999) (unpublished disposition); *accord Murray v. E*Trade Fin. Corp.*, 240 F.R.D. 392, 397 (N.D. Ill. 2006) (in order to establish typicality under Rule 23(a)(3), "the class representative must be a member of the proposed class" and must "[be] based on the same legal theory" (citing *Cavin*, 236 F.R.D. at 392; *Owner-Operator Indep. Drivers Ass'n, Inc. v. Allied Van Lines*, Inc., 231 F.R.D. 280, 282 (N.D. Ill. 2005)).

Ratulowski plausibly claims PNC breached the express terms of his particular finance agreement and GAP Addendum, but he entered these agreements before the applicable Automatic Refund Law went into effect. While he may seek to represent similarly aggrieved Indiana customers who entered finance agreements assigned to PNC that contained substantially similar cancellation and termination provisions obligating PNC to automatically refund unearned GAP fees pro-rata in the event of an early payoff of their finance agreements, he cannot seek to represent a class based on the theory that PNC violated Automatic Refund Laws that were never incorporated as implied terms of his agreements. For this reason, the motion to strike the Multi-State

Class and Indiana Subclass will be granted. However, Ratulowski will be granted a final opportunity to amend his complaint to address the deficiencies in his class allegations (and perhaps narrow them to similarly situated individuals who bought similar GAP coverage, as Ratulowski did in Indiana.)

*   *   *

A final issue is worth noting at this point. Ratulowski admittedly did not reside in or purchase a GAP product in any state other than Indiana, yet he seeks to represent a Multi-State Class of consumers in five other states. At this juncture I will withhold judgment on the propriety of Ratulowski asserting class claims on behalf of customers aggrieved by violations of consumer protection laws in states in which he does not reside and has never purchased a GAP product. However, the First Amended Complaint does not appear to allege a personal injury-in-fact in the five other states included in the putative Multi-State Class.

It is therefore questionable whether Ratulowski has standing to bring such claims—as opposed to a customer who resided in and purchased a GAP product assigned to PNC in one of those five states. *See, e.g.*, *Catlin v. Hanser*, No. 1:10-CV-0451-LJM-DML, 2011 WL 1002736, at *8 (S.D. Ind. Mar. 17, 2011) (citing *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 396 (7th Cir. 2009)) (dismissing thirty-three statutory state consumer fraud claims where plaintiff lacked standing personally to bring such claims, but permitting plaintiff to proceed on statutory state consumer fraud claims in Indiana and California, where he plausibly alleged an injury-in-fact); *accord In*

*re Diary Farmers of America, Inc. Cheese Antitrust Litig.*, No. 09-CV-3690, 2013 WL 4506000, at *8 (N.D. Ill. Aug. 23, 2013); *Zaycer v. Sturm Foods, Inc.*, 896 F. Supp. 2d 399, 409 (D. Md. 2012). At this point PNC appears to have a strong argument that Ratulowski cannot seek to represent customers harmed in states other than Indiana based on Automatic Refund Laws in place in those jurisdictions, where he does not reside and never contracted for GAP coverage.

### Conclusion

For the foregoing reasons, PNC's Motion to Dismiss Plaintiff's First Amended Multi-State Class Action Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) [DE 31] is **GRANTED IN PART AND DENIED IN PART**. Count II (money had and received) and Count III (declaratory judgment) are **DISMISSED WITHOUT PREJUDICE**. PNC's Motion to Strike Class Allegations from Plaintiff's First Amended Multi-State Class Action Complaint [DE 33] is **GRANTED**. Ratulowski will be given 30 days from the date of this order in which to file a an amended complaint.

**SO ORDERED.**

ENTERED: May 10, 2023.

         /s/ Philip P. Simon
         PHILIP P. SIMON, JUDGE
         UNITED STATES DISTRICT COURT