**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | |
|---|---|
| VINCENT I. RATULOWSKI, on behalf of himself and all others similarly situated, | Case Number: 2:22-cv-00004-PPS-APP |
| Plaintiff | Judge Philip P. Simon |
| v. | Magistrate Judge Andrew P. Rodovich |
| PNC BANK, N.A. d/b/a PNC AUTO FINANCE, | |
| Defendant | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT PNC BANK, N.A.'S MOTION TO
STRIKE CLASS ALLEGATIONS FROM PLAINTIFF'S SECOND AMENDED
CLASS ACTION COMPLAINT**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ..........................................................................................................7

II.     LEGAL STANDARD......................................................................................................11

III.    FACTUAL BACKGROUND..........................................................................................12

        A.     The Breach of Contract Class ................................................................................12

        B.     The Unlawful Business Practices Class .................................................................12

        C.     The Excessive Fee Class ........................................................................................13

IV.    ARGUMENT...................................................................................................................14

        A.     Plaintiff is a Typical and Adequate Representative of the Members of the
                  Unlawful Business Practice and Excessive Fee Classes.......................................14

             1.     PNC's Statute of Limitations Defense to Plaintiff's UCCC Claims Will
                        Not Defeat Typicality or Adequacy ........................................................15

        B.     PNC Has Not Shown that Any Individualized Inquiries Will Be Required for the
                  Unlawful Business Practice and Excessive Fee Classes or that the Supposed
                  Individualized Inquiries Would Defeat Class Certification...................................19

             1.     PNC's Has Not Shown that Individualized Issues Will Predominate for
                        Unlawful Business Practice and Excessive Fee Classes...........................19

             2.     PNC Incorrectly Argues the Excessive Fee Class is not Ascertainable.....20

                      a)     The Class is Clearly Defined and Based on Objective Criteria.....20

                      b)     PNC Improperly Relies on Extrinsic Evidence But the Evidence
                          Actually Proves Plaintiff's Allegation ...........................................22

        C.     The Existence of Arbitration Agreements Will Not Defeat Class Certification....25

        D.     Determining Which GAP Agreements Have Cancellation and Termination
                  Provisions Substantially Similar to Plaintiff's GAP Agreement is not Grounds to
                  Strike the Class Allegations ...................................................................................27

        E.     PNC's "Joinder" Argument is not Well Taken......................................................29

V.      CONCLUSION....................................................................................... 31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Advanced Dermatology v. Fieldwork, Inc.*,
   550 F. Supp. 3d 555 (N.D. Ill. 2021) .....................................................................11

*Beaton v. SpeedyPC Software*,
   907 F.3d 1018 (7th Cir. 2018) ..................................................................... *passim*

*Beck v. Maximus, Inc.*,
   457 F.3d 291 (3d Cir. 2006)......................................................................... *passim*

*Beyer v. Michels Corp.*,
   No. 21-CV-514-PP, 2023 WL 2693439 (E.D. Wis. Mar. 29, 2023) ........................7

*Butler v. Sears, Roebuck and Co.*,
   727 F.3d. 796 (7th Cir. 2013) ................................................................................11

*CE Design Ltd. v. King Architectural Metals, Inc.*,
   637 F.3d 721 (7th Cir. 2011) ............................................................................7, 15

*Chavez v. Illinois State Police*,
   251 F.3d 612 (7th Cir. 2001) ................................................................................31

*Cima v. WellPoint Health Networks, Inc.*,
   250 F.R.D. 374 (S.D. Ill. 2008) ............................................................................29

*Dietrich v. C.H. Robinson Worldwide, Inc.*,
   No. 18 C 4871, 2018 WL 6399199 (N.D. Ill. Dec. 6, 2018) ...........................9, 26

*Dowding v. Nationwide Mut. Ins. Co.*,
   490 F. Supp. 3d 1291 (N.D. Ill. 2020) ..................................................................11

*Drake v. Mirand Response Sys., Inc.*,
   No. 119CV01458RLYDML, 2020 WL 4218335 (S.D. Ind. July 22, 2020) ......7, 11

*Fairley v. McDonald's Corp.*,
   No. 20-CV-02273, 2021 WL 3054804 (N.D. Ill. July 20, 2021)............................11

*Fischer v. Instant Checkmate LLC*,
   No. 19 C 4892, 2022 WL 971479 (N.D. Ill. Mar. 31, 2022) ...........................25, 27

*Garcia v. JCPenney Corp., Inc.*,
   No. 12-CV-3687, 2016 WL 878203 (N.D. Ill. Mar. 8, 2016)................................25

*Gen. Refractories Co. v. First State Ins. Co.*,
   500 F.3d 306 (3d Cir. 2007)..............................................................31

*Heredia v. Sunrise Senior Living LLC*,
   No. 818CV01974JLSJDE, 2019 WL 5149854 (C.D. Cal. Mar. 4, 2019) ..............................26

*Hernandez v. Apple Auto Wholesalers of Waterbury LLC*,
   2022 WL 4593104 (D. Conn. Sept. 30, 2022) ........................................30

*Isaacs v. Sprint Corp.*,
   261 F.3d 679 (7th Cir. 2001) ............................................................29

*Koos v. First Nat. Bank of Peoria*,
   496 F.2d 1162 (7th Cir. 1974) ..........................................................15

*Lewis v. Clarke*,
   581 U.S. 155 (2017)..........................................................................31

*Lukis v. Whitepages Inc.*,
   535 F. Supp. 3d 775 (N.D. Ill. 2021) ...............................................22

*Mullins v. Direct Digital, LLC*,
   795 F.3d 654 (7th Cir. 2015) ...............................................9, 20, 21, 22

*Nat'l Convention Servs., LLC v. Applied Underwriters Captive Risk Assurance Co.*,
   No. 15-cv-7063, 2019 WL 3409882 (S.D.N.Y. July 27, 2019)............................................27

*Nelson v. IPALCO Enterprises, Inc.*,
   No. IP02-477CHK, 2003 WL 23101792 (S.D. Ind. Sept. 30, 2003)......................................15

*Outzen v. Kapsch TrafficCom USA, Inc.*,
   No. 120CV01286TWPMJD, 2021 WL 4454112 (S.D. Ind. Sept. 29, 2021) ..................15, 18

*Robinson v. OnStar*,
   LLC, No. 15-cv-1731, 2020 WL 364221 (S.D. Cal. Jan. 22, 2020)........................................27

*In re Titanium Dioxide Antitrust Litig.*,
   962 F. Supp. 2d 840 (D. Md. 2013) ...................................................27

*Transp. Fact., Inc. v. Pac-Paper, Inc.*,
   885 F.2d 875, 1989 WL 107823 (9th Cir. 1989) ................................30

*Wahl v. Midland Credit Mgmt., Inc.*,
   243 F.R.D. 291 (N.D. Ill. 2007)........................................................15

**Other State Cases**

*Ind. Spine Group, PC v. Pilot Travel Ctrs., LLC,*
    959 N.E.2d 789 (Ind. 2011) ........................................................................17

*Jefferson Smurfit Corp. v. Indiana Dep't of State Revenue,*
    681 N.E.2d 806 (Ind. T.C. 1997) ........................................................16, 17, 18

*Romack v. State,*
    446 N.E.2d 1346 (Ind. Ct. App. 1983)..........................................8, 16, 17

**Federal Statutes**

12 U.S.C.
    § 5481(5), (6), (15).............................................................................12, 13
    § 5481(5)(A) ............................................................................................13
    § 5481(15)(A)(i), 15(A)(x).......................................................................13
    §§ 5531(a), 5536(1)(B) ...........................................................................13
    § 5536(1)(B).............................................................................................12

72. The Consumer Protection Act .........................................................................12

Code ("UCCC") ...................................................................................................7

Consumer Protection Act .............................................................................12, 13

Dodd-Frank Consumer Protection Act ..............................................................12

Public Records Act ............................................................................................22

UCCC...................................................................................................... *passim*

**Other State Statutes**

DE 65-1 through 65-9. PNC's Public Records Act .............................................22

Ind. Code
    § 24-4.5-1-102(7) ...............................................................................12, 13
    § 24-4.5-1-301.5(6)..................................................................................12
    § 24-4.5-2-107.........................................................................................14
    § 24-4.5-2-202.........................................................................................13
    § 24-4.5-2-202(1)(c) (effective prior to July 1, 2018) ..............................14
    § 24-4.5-2-202(4).....................................................................................14
    § 24-4.5-5-202(3).........................................................................8, 13, 18
    § 24-4.5-5-202(4).....................................................................................16
    § 24-4.5-5-202 subsec. (3) ......................................................................19
    § 24-4.5-5-202 subsec. (4) .............................................................8, 16, 17

UCC subsec. (3) ................................................................................................................16

**Other Authorities**

16 C.F.R. § 433.2(a) ..........................................................................................................30

16 C.F.R. § 433.29(a) ........................................................................................................29

Federal Rule of Civil Procedure 19 ..................................................................................31

Federal Rule of Civil Procedure 20 ..................................................................................30

*Intercon Rsch. Assocs., Ltd. v. Dresser Indus* ................................................................30

Rule 23 ...................................................................................................................10, 28, 29

## I.      INTRODUCTION

Motions to strike class allegations are "generally disfavored." *Beyer v. Michels Corp.*, No. 21-CV-514-PP, 2023 WL 2693439, at *12 (E.D. Wis. Mar. 29, 2023) (collecting cases).  PNC, as the party moving to strike Plaintiff's class allegations, bears the burden of establishing that "no possible set of factual allegations ... could justify certifying a class.'" *Drake v. Mirand Response Sys., Inc.*, No. 119CV01458RLYDML, 2020 WL 4218335, at *2 (S.D. Ind. July 22, 2020) (citation omitted).  PNC has not met its burden.  Plaintiff should be permitted to conduct discovery and move for class certification.  This Court can then make its class certification decision based on a fully developed  record.  None of PNC's arguments dictate a different result.

First, PNC has not established that any of its proffered defenses to Plaintiff's claims under Indiana's Uniform Commercial Credit Code ("UCCC") will make Plaintiff an atypical or inadequate class representative of the Unlawful Business Practice and Excessive Fee Classes.  To defeat class certification on that ground, PNC must show "some degree of likelihood" that a "defense will play a significant role at trial." *Beck v. Maximus, Inc.*, 457 F.3d 291, 300 (3d Cir. 2006) (citing *Hardy v. City Optical Inc.*, 39 F.3d 765, 770 (7th Cir. 1994).  PNC's motion makes no attempt to make that showing and it would be premature to hold that any defense will play a major role at trial.  For example, PNC's statute of limitations defense to Plaintiff's UCCC claims turns on a question of law that will be decided in connection with PNC's pending motion to dismiss.  PNC's proffered defenses to the UCCC claims (including its statute of limitations and pre-suit demand defenses, and its argument that Plaintiff's trade-in dealer "paid" the unearned GAP fees charged by PNC) are also not "substantial" and therefore will not defeat adequacy or typicality. *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 728 (7th Cir. 2011) (defendants cannot "derail legitimate class actions by conjuring up … insubstantial defenses

unique to the class representative").  The frivolous nature of those defenses is set forth below and in greater detail in Plaintiff's opposition to PNC's pending motion to dismiss.  Finally, PNC's proffered defenses are not "unique" to Plaintiff and thus cannot defeat adequacy or typicality. They instead apply to a large segment of the class and thus will not defeat class certification. *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1027 (7th Cir. 2018) ("A representative might be inadequate if he is subject to a substantial defense unique to him.")

Second, PNC has not met its burden of showing that individual issues will predominate related to its pre-suit demand defense to Plaintiff's UCCC claims.  PNC's pre-suit demand defense will fail as a matter of law.  The defense is based on language that is limited to claims for statutory penalties brought under subsection (4) of Ind. Code § 24-4.5-5-202.  Plaintiff's UCCC claims, in contrast, are brought pursuant to subsection (3) –which does not require a pre-suit demand.  Ind. Code § 24-4.5-5-202(3).  As established in Plaintiff's opposition to the motion to dismiss, "under elementary rule[s] of statutory construction," PNC cannot properly ask this Court to transport a pre-suit demand requirement from one subsection of a law and apply it to a different subsection. *Romack v. State*, 446 N.E.2d 1346, 1353 (Ind. Ct. App. 1983).  Further, even if PNC's defense does not fail as a matter of law, Plaintiff still must be permitted to seek discovery to rebut PNC's argument.  For example, discovery will likely show that identifying whether a customer made a pre-suit demand is a ministerial task that can be accomplished by, for example, reviewing PNC's records.  Striking the class allegations would thus be improper.

Third, PNC has failed to demonstrate that the need to identify which customers were sold a GAP agreement that was not approved by the Indiana Department of Financial Institutions (the "DFI") will defeat certification of the Excessive Fee Class.  Whether the DFI approved a GAP program, including the form template GAP agreement signed by the customer, relates to the

ascertainability of the Excessive Fee Class.  Ascertainability is met here because the Excessive Fee Class is (a) "defined clearly" to include only those customers who were sold GAP programs and agreements <u>not</u> approved by the DFI, and (b) whether the DFI gave such approval is an "objective criteria."  *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015).  Discovery is expected to reveal business records identifying which GAP programs and agreements were approved by the DFI, and which were not.  Thus, the Parties and the Court will be able to objectively identify the members of the Class based on their GAP agreement forms.  It is entirely premature to conclude that this will be an unmanageable task.  This is why the Seventh Circuit has made clear that courts "normally" should certify a class in these circumstances and "wait and see how serious the problem may turn out to be after settlement or judgment, when much more may be known about available records, response rates, and other relevant factors."  *Id.* at 664.

Fourth, the existence of arbitration agreements signed by some putative class members is not grounds to strike the class allegations.  Once PNC identifies those putative class members in discovery, and if PNC chooses to enforce the arbitration agreements, Plaintiff can exclude them from the class.  *See, e.g.*, *Dietrich v. C.H. Robinson Worldwide, Inc.*, No. 18 C 4871, 2018 WL 6399199, at *1 (N.D. Ill. Dec. 6, 2018) (even if it is "likely" plaintiff will need to exclude individuals who signed arbitration agreements from the class motion to strike should be denied).

Fifth, PNC has not met its burden of showing any individualized inquiries into the terms of the class member's contracts will predominate and thus defeat certification of the Breach of Contract Class.  Consistent with this Court's prior order, the Breach of Contract Class in the SAC is limited to customers whose GAP agreements contained substantially similar cancellation and termination provisions obligating PNC to automatically refund unearned GAP fees in the event of an early payoff of their finance agreement.  DE 53, p. 34; DE 56, ¶ 40(a).  Plaintiff is entitled in

discovery to obtain copies of the GAP agreements entered by customers (many of which will be identical) and determine which GAP agreements meet that criteria. Plaintiff will then identify those GAP agreements as part of his motion for class certification. If PNC disagrees with Plaintiff's assessment of which GAP agreements contain substantially similar cancellation and termination provisions obligating PNC to automatically refund unearned GAP fees in the event of an early payoff, PNC can oppose class certification of the Breach of Contract Class on that ground. The Court can then call a ball or a strike after reviewing those agreements. But PNC cannot shortcut that process simply because PNC contends that reviewing the GAP agreements will be an "extensive" task for the parties or for the Court. (Plaintiff's counsel knows from its past experience reviewing GAP agreements that this will not be a difficult task because GAP agreements often contain identical or substantially similar cancellation and termination provisions, and can be grouped based on those terms and their form numbers). Whether the Breach of Contract Class is certified must be based on whether the elements of Rule 23 are met, not based on the amount of discovery or briefing required for class certification or the workload required for the Court to rule on the motion.

Sixth, the joinder of dealers or GAP Administrators in this case is neither proper nor required. Those entities are *not* parties to the finance agreements or GAP Addendums at issue in this lawsuit, nor are those entities alleged to have any contractual, statutory or legal duty to Plaintiff or the Class. Moreover, PNC's argument for joinder is based on the incorrect contention that those entities, not PNC, collected the GAP fees from Plaintiff and the Class. PNC's contention improperly ignores Plaintiff's allegations (and the obvious reality) that *PNC* collected those fees from its customers and is the only party with the contractual obligation to refund those fees to the customer after the assignment of the finance agreement. DE 26, ¶¶ 9-12.

In sum, as the Seventh Circuit eloquently observed, "[t]he *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or fanatic sues for $30." *Carnegie Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (emphasis in original).  Here, Plaintiff alleges that PNC wrongfully charged and kept *millions of dollars* in excess GAP fees. Consequently, denying class certification would mean that PNC could keep *millions of dollars* of ill-gotten gains, without ever having to defend its GAP practices on the merits.  *See Butler v. Sears, Roebuck and Co.*, 727 F.3d. 796, 801 (7th Cir. 2013) (recognizing it is unlikely that customers would sue for a "few hundred dollars . . . considering the costs and distractions of litigation.")  Such an important decision should be based on a fully developed record and not prematurely curtailed at the pleading stage.

## II.    LEGAL STANDARD

Motions to strike class allegations are "disfavored."  DE 53 at p. 30 (quoting *Beyer v. Michels Corp.*, No. 21-CV-514-PP, 2023 WL 2693439, at *12 (E.D. Wis. Mar. 29, 2023) (collecting cases); *see also Fairley v. McDonald's Corp.*, No. 20-CV-02273, 2021 WL 3054804, at *4 (N.D. Ill. July 20, 2021).  "The burden falls on the defendant to demonstrate that 'no possible set of factual allegations ... could justify certifying a class.'"  *Drake v. Mirand Response Sys., Inc.*, No. 119CV01458RLYDML, 2020 WL 4218335, at *2 (S.D. Ind. July 22, 2020) (quoting *Cox v. Sherman Capital LLC*, No. 1:12-CV-01654-TWP, 2014 WL 1328147, at *9 (S.D. Ind. Mar. 31, 2014).)  "The court accepts the plaintiff's allegations supporting class certification as true."  *Id.* at *2.  Therefore, class allegations should be stricken only in the "exceptional case" where the complaint is "so facially lacking that no amount of discovery or time could provide support for class status."  *Advanced Dermatology v. Fieldwork, Inc.*, 550 F. Supp. 3d 555, 568–69 (N.D. Ill. 2021) (citation omitted); *Dowding v. Nationwide Mut. Ins. Co.*, 490 F. Supp. 3d 1291, 1298 (N.D. Ill. 2020) (moving party has burden "to definitively establish that a class action cannot be

maintained consistent with the class allegations.").

## III.   FACTUAL BACKGROUND

This putative class action concerns PNC overcharging, and failing to refund, fees for GAP coverage.  Plaintiff brings the action on behalf himself and three classes.

### A.   The Breach of Contract Class

On May 15, 2023, this Court denied PNC's motion to dismiss Plaintiff's breach of contract claim.  DE 53.  The Court found it "plausible" that Plaintiff's early payoff of his finance agreement "cancelled his GAP coverage, entitling him to a pro-rata refund of any unearned GAP fees."  DE 53, p. 26.  The Court further held that Plaintiff "may seek to represent similarly aggrieved Indiana customers who entered finance agreements assigned to PNC that contained substantially similar cancellation and termination provisions obligating PNC to automatically refund unearned GAP fees pro-rata in the event of an early payoff of their finance agreements."  *Id.*, p. 34.  Plaintiff's SAC pleads a Breach of Contract Class along the exact lines previously outlined by the Court.  DE 56, ¶ 40.  The SAC also notes that with the benefit of discovery, Plaintiff will be able to "objectively identif[y]" the substantially similar GAP agreements "by their form numbers."  *Id.*

### B.   The Unlawful Business Practices Class

Plaintiff's SAC also pleads an Unlawful Business Practices Class.  That Class relates to Plaintiff's allegation that PNC has violated the Dodd-Frank Consumer Protection Act and therefore violated the UCCC.  The UCCC provides that "[a] violation of a [] federal law, regulation, or rule applicable to consumer credit transactions is a violation" of the UCCC.  Ind. Code § 24-4.5-1-102(7); SAC, ¶ 72.  The Consumer Protection Act is a federal law applicable to consumer credit transactions, and therefore a violation of the Consumer Protection Act is, in turn, a violation of the UCCC.  12 U.S.C. § 5481(5), (6), (15), 12 U.S.C. § 5536(1)(B); Ind. Code § 24-4.5-1-301.5(6);

Ind. Code § 24-4.5-1-102(7).

The Consumer Protection Act makes it "unlawful" for any "covered person" to "engage in any unfair, deceptive, or abusive act or practice" in connection with any transaction with a consumer involving a financial product or service. 12 U.S.C. §§ 5531(a), 5536(1)(B). PNC is a "covered person" under the Consumer Protection Act because it "engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(5), (6), (15).[1] Plaintiff alleges that PNC's practice of collecting and failing to ensure a refund of unearned GAP fees upon an early payoff is an "unfair" and/or "deceptive" practice in violation the Consumer Protection Act and therefore further violates the UCCC. DE 53, ¶ 3(a), 74-895. Plaintiff and the members of the Unlawful Business Practices class thus have a "right to a refund" of their unearned GAP fees under the UCCC. Ind. Code § 24-4.5-5-202(3).

## C.     The Excessive Fee Class

The SAC also pleads an Excessive Fee Class. The Excessive Fee Class relates to Plaintiff's allegation that PNC is liable to Plaintiff and the members of that Class for GAP fees charged to them that were not approved by the DFI. DE 56, ¶¶ 4, 87-88.

A fee for GAP coverage is an "additional charge" under the UCCC that can only be contracted for and received under specified conditions. Ind. Code § 24-4.5-2-202. As effective prior to July 1, 2018, a charge for GAP coverage was only permitted if it was "reasonable in relation to the benefits" and only if it was "excluded as [a] permissible additional charge[] from the credit

---

[1] "Extending credit and servicing loans, including acquiring, purchasing, selling, brokering, or other extensions of credit" and "collecting debt related to any consumer financial product or service" both fall within the definition of a "financial product or service." 12 U.S.C. § 5481(15)(A)(i), 15(A)(x). Those financial products and services also fall within the definition of a "consumer financial product or service" when offered or provided for use by consumers primarily for personal, family, or household purposes." 12 U.S.C. § 5481(5)(A).

service charge." Ind. Code § 24-4.5-2-202(1)(c) (effective prior to July 1, 2018).[2]  That required the "seller"[3] of the GAP coverage to apply for and receive DFI approval for its GAP program, including approval of the specific GAP agreement form template to be sold to customers.  *Id.*[4]

Plaintiff alleges he and the members of the Excessive Fee Class entered into finance agreements with GAP addendums in Indiana prior to July 1, 2018 that included charges for GAP fees that were not approved by the DFI.  DE 56, ¶ 88.  As such, the GAP fees were unauthorized "additional charges" under the UCCC and PNC was not permitted to charge and collect those fees from Plaintiff and the members of the Excess Fee Class.  *Id.*[5]

## IV.   ARGUMENT

### A.   Plaintiff is a Typical and Adequate Representative of the Members of the Unlawful Business Practice and Excessive Fee Classes

PNC argues the Court should strike the Unlawful Business Practice and Excessive Fee Classes allegations on grounds Plaintiff will be unable to establish he is a typical or adequate class representative for those Classes.  DE 64, pp. 6-8.  PNC's argument is based on Plaintiff's UCCC claims supposedly being subject to three defenses.  *Id.*  For a defense to defeat a named plaintiff's typicality or adequacy the defense must meet at least three prerequisites.

---

[2] GAP remains an "additional charge" under the UCCC, but effective July 1, 2018 the statute was amended such that submission to and approval by the DFI is not required and instead certain other conditions must be met in order for the GAP fee to be a permitted additional charge.  *See* Ind. Code § 24-4.5-2-202(4).  A printout showing the changes made by the amendment effective July 1, 2018 is attached to the SAC as Exhibit 2 (DE 56-2).

[3] "Seller" is defined as "a person regularly engaged as a creditor in making consumer credit sales" and "includes an assignee of the seller's right to payment."  Ind. Code § 24-4.5-2-107.

[4] Specifically, the statute provided that "to be a permitted additional charge [] the seller must submit a written explanation of the charge to the [DFI] indicating how the charge would be assessed and the value or benefit to the consumer."  Ind. Code § 24-4.5-2-202(1)(c) (as effective prior to July 1, 2018) (DE 56-2).  The DFI would then "determine whether the charge would be of benefit to the consumer and [was] reasonable in relation to the benefits."  *Id.*  Only if the DFI made that determination was the GAP fee a permitted "additional charge."  *Id.*

[5] Plaintiff has also pled a money had and received claim on behalf of himself and members of the Unlawful Business Practices and Excessive Fee Classes who were charged and paid unlawful GAP fees. DE 56, ¶¶ 91-94.

*First*, there must be "some degree of likelihood" that the "defense will play a significant role at trial." *Beck*, 457 F.3d at 300 (citing *Hardy*, 39 F.3d at 770; *see also Koos v. First Nat. Bank of Peoria*, 496 F.2d 1162, 1164 (7th Cir. 1974) (to defeat typicality or adequacy a defense must be likely to be a "a major focus of the litigation."); *Outzen v. Kapsch TrafficCom USA, Inc.*, No. 120CV01286TWPMJD, 2021 WL 4454112, at *13 (S.D. Ind. Sept. 29, 2021) (to defeat class certification a defense must be "likely to usurp [the plaintiff's] time and energy to the detriment of the class.") (citation omitted).

*Second*, the defense must be not just "arguable" but also "substantial." *Beaton*, 907 F.3d at 1027 ("A representative might be inadequate if he is subject to a substantial defense unique to him."); *CE Design*, 637 F.3d at 728 (defendants cannot "derail legitimate class actions by conjuring up … insubstantial defenses unique to the class representative").

*Third*, the defense must be "unique" to the named plaintiff. *Id*; *see also Nelson v. IPALCO Enterprises, Inc.*, No. IP02-477CHK, 2003 WL 23101792, at *9 (S.D. Ind. Sept. 30, 2003) ("because the release defense, such as it is, applies to hundreds of the class members, it simply presents one more issue of broad application suitable for classwide resolution.")

Further, even if those three prerequisites are met, courts will generally allow plaintiffs to cure the issue by substituting a new class representative, rather than deny class certification. *Wahl v. Midland Credit Mgmt., Inc.*, 243 F.R.D. 291, 298 (N.D. Ill. 2007); *see also Nelson*, 2003 WL 23101792, at *6, n. 2.

### 1.    PNC's Statute of Limitations Defense to Plaintiff's UCCC Claims Will Not Defeat Typicality or Adequacy

PNC argues its statute of limitations defense to Plaintiff's UCCC claims will prevent Plaintiff from serving as a typical or adequate representative of the Unfair Business Practice and Excessive Fee Classes. DE 64, p. 7.  PNC has not met its burden for at least three reasons.

First, PNC's statute of limitations defense turns on a question of law.  It turns on the question of whether the one-year limitations period expressly applicable to only those claims brought under subsection (4) of Ind. Code § 24-4.5-5-202 can be, nevertheless, transported and imposed on claims brought under subsection (3) of the UCC.  That question of law, and thus PNC's defense, will be resolved in connection with PNC's pending motion to dismiss the UCCC claims.  PNC therefore cannot meet its burden of "show[ing] some degree of likelihood" that the "defense will play a significant role at trial."  *Beck*, 457 F.3d at 300.

Second, PNC's statute of limitations defense is not "substantial," as is required to defeat class certification.  *Beaton*, 907 F.3d at 1027.  As set forth in greater detail in Plaintiff's opposition to the motion to dismiss, subsection (4)'s one-year limitations period by its terms only applies to claims for statutory penalties brought "pursuant to this subsection."  Ind. Code § 24-4.5-5-202(4).  Under "elementary rule[s] of statutory construction" the statute of limitations in subsection (4) "is intended to apply solely to the subdivision in which it is contained and to exclude its application from all of the rest."  *Romack*, 446 N.E.2d at 1353; *see also Jefferson Smurfit Corp. v. Indiana Dep't of State Revenue*, 681 N.E.2d 806, 810 (Ind. T.C. 1997) ("Courts are not free to assume that the legislature's use of language in one subsection [is] applicable to a separate and distinct subsection.").  Thus, it cannot be applied to subsection (3).

Third, PNC's statute of limitations is not "unique" to Plaintiff.  The class period for the Unlawful Business Practice Class is limited to customers who paid off their finance agreements early from January 7, 2012 to the present.  The class period for the Excessive Fee Class is limited to customers who both entered into GAP agreements prior to July 1, 2018 and paid GAP fees from

16

January 7, 2012 to the present.[6]  PNC's argument that a one-year statute applies to the UCCC claims, if correct, would therefore apply to the overwhelming majority of the members of the Unlawful Business Practices and Excess Fee Classes.  It thus cannot defeat typicality or adequacy.

### 2.     PNC's Pre-Suit Demand Defense to Plaintiff's UCCC Claims Will Not Defeat Typicality or Adequacy

PNC's pre-suit demand defense also does not defeat typicality or adequacy.

First, PNC has not met its burden of showing its pre-suit demand defense "will play a significant role at trial." *Beck*, 457 F.3d at 300.  Like the statute of limitations defense, it is based on a question of law that will be decided at the pleading stage.  Specifically, it turns on whether subsection (4)'s pre-suit demand requirement for penalty claims can be transported and applied to subsection (3)'s claims for refunds, even though subsection (3) does not have a pre-suit demand requirement.  As such, PNC has not shown that it will play a major role at trial.

Second, PNC's defense is not "substantial" for the same reasons as the statute of limitations defense. *Beaton*, 907 F.3d at 1027.  Both arguments are based on an impermissible reading of the UCCC and PNC's attempt to transport provisions limited to subsection (4) and apply them to subsection (3). *Romack*, 446 N.E.2d at 1353; *Jefferson Smurfit*, 681 N.E.2d at 810.

Third, PNC's pre-suit demand defense is not "unique" to Plaintiff.  The overwhelming majority (if not all) of the members of the Unlawful Business Practices Class and the Excessive Fee Classes did not send PNC a pre-suit letter or make a pre-suit call specifically demanding a refund of the excess charges.  The defense, if it is not rejected as a matter of law, will therefore be a common issue ripe for class wide resolution, is not a "unique" issue.

---

[6] The class periods are based on the applicable ten-year statute of limitations.  Subsection (3) of Section 24-4.5-5-202 does not prescribe a statute of limitations for claims brought pursuant to that subsection.  Accordingly, Indiana's general ten-year statute of limitations applies.  Ind. Code § 34-11-1-2.  That statute of limitations was enacted "for the very purpose of supplying a statute of limitation when one has not otherwise been provided by a more specific statutory scheme." *Ind. Spine Group, PC v. Pilot Travel Ctrs., LLC*, 959 N.E.2d 789, 794 (Ind. 2011).

**3.      PNC's Argument That Plaintiff Is Not the Person Who "Paid" the Allegedly Excess GAP Will Not Defeat Typicality or Adequacy**

Third, PNC argues Plaintiff is not the one who "paid" the excess GAP fees that PNC collected as part of the early payoff, and thus he is an inadequate or atypical representative of the Unlawful Business Practices and Excess Fee Classes.  DE 64, p. 8.  PNC's argument is based on Plaintiff authorizing his trade-in dealer to pay his money to PNC on his behalf, rather than Plaintiff transmitting his money directly to PNC as part of his early payoff.  *Id.*  PNC's argument does not apply to allegedly unauthorized GAP fees Plaintiff sent directly to PNC as part of his monthly payments.  PNC has not shown that its defense will make Plaintiff an atypical or inadequate.

First, PNC has not shown the defense is likely to play a "significant role at trial."  *Beck*, 457 F.3d at 300.  The parties do not dispute the facts behind that defense – i.e., that Plaintiff authorized Gateway Motors to make his early payoff with his money on his behalf, rather than sending the payment directly.  Thus, while the parties may dispute whether that means Plaintiff or Gateway Motors "paid" the unearned GAP fees– as the term "paid" is used in Ind. Code § 24-4.5-5-202(3) – PNC has not shown the issue will be time consuming or a fact intensive matter at trial.

Second, PNC's "paid" defense is not "substantial."  *Beaton*, 907 F.3d at 1027.  It is undisputed that Plaintiff directly sent GAP fees to PNC as part of his monthly payments made prior to his early payoff.  And, as this Court found previously, PNC's argument that Plaintiff's trade-in dealer is the one that paid the unearned GAP fees is "a little hard to swallow" because "it's pretty obvious that everyone involved in the trade-in understood that it was [Plaintiff's] money (whether borrowed or paid up-front) that was ultimately funding the early payoff of his finance agreement."  DE 53, p. 13.

Third, PNC's "paid" defense to Plaintiff's UCCC claims is not "unique" to Plaintiff.  *Outzen*, 2021 WL 4454112, at *13.  The overwhelming majority of class members will share the

same fact pattern as Plaintiff.  They made direct monthly payments to PNC over the course of their finance agreements, and those monthly payments included charges for GAP fees.  DE 56, ¶ 4, 12, 34-35, 87-88.  Then, as part of trading-in their respective cars and purchasing a new car, they (a) entered into a new finance agreement, (b) borrowed all or part of the money to make the early payoff to PNC by including it in the amount financed in their new finance agreement with their trade-in dealer; (c) authorized the trade-in dealer to make that early payoff payment on their behalf; and (d) PNC included unearned GAP fees in the required payoff amount.  DE 56, ¶ 32-35, 82, 85.

    **B.**    **PNC Has Not Shown that Any Individualized Inquiries Will Be Required for the Unlawful Business Practice and Excessive Fee Classes or that the Supposed Individualized Inquiries Would Defeat Class Certification**

        **1.**    **PNC's Has Not Shown that Individualized Issues Will Predominate for Unlawful Business Practice and Excessive Fee Classes**

PNC moves to strike both the Unlawful Business Practice and Excessive Fee Class allegations on grounds of a supposed need for the Court to "individually determine" (1) whether the Class member made a pre-suit demand for a refund and whether PNC refused to comply with it in a reasonable time; (2) whether the Class member "paid" the allegedly excess GAP charges, as that term is used in subsection (3) of Ind. Code § 24-4.5-5-202; and (3) whether the Class member received a refund of the excess charges from the GAP administrator that administered their GAP agreement for PNC.  Each of those arguments fails.  DE 64, pp. 9-10

First, as noted above, Plaintiff's claims under subsection (3) of Ind. Code § 24-4.5-5-202 do not require a pre-suit demand  But even if it were otherwise (and it is not), PNC presumably keeps records of (i) any refund demands it receives, (ii) when it receives such refund demands, (iii) any refunds it issues, and (iv) the date any such refund was issued.  Plaintiffs thus may seek discovery on those items.

Second, as set forth above, PNC's customers who traded-in their car and had their trade-in dealer make the early payoff on their behalf obviously still "paid" the unearned GAP fees that PNC included in the payoff amount.  But even if that were a legitimately disputed issue, (a) every Excessive Fee Class member will have directly paid unauthorized GAP charges directly to PNC as part of their monthly payments made prior to the early payoff, and (b) PNC's records should establish whether PNC received each customer's early payoff payment (which included excess charges for GAP) from a trade-in dealer or directly from the customer.  DE 56, ¶ 12; DE 35-3, p. 3.  Moreover, because a huge percentage of customers will have authorized a trade-in dealer to make the early payment on their behalf, whether those customers "paid" the excess charges would be a common issue that will support class certification.

Third, PNC contends that "whether a dealer or GAP administrator separately refunded GAP fees" to any member of the Unlawful Business Practice and Excess Fee Classes is an individual issue that will predominate.  DE 64, p. 10.  Whether a dealer or GAP administrator issued a refund of excess GAP charges is an objective fact, not an individual issue.  Even assuming, *arguendo*, that PNC does not have its own records of any such refunds, the dealers/GAP administrators should have such records.  But even if they do not, PNC's argument merely presents an ascertainability question and the "normal" course would be to "wait and see how serious the problem may turn out to be after settlement or judgment.  *Mullins*, 795 F.3d at 657.

### 2.       PNC Incorrectly Argues the Excessive Fee Class is not Ascertainable

### a)       The Class is Clearly Defined and Based on Objective Criteria

PNC moves to strike the Excessive Fee Class on grounds the class is not ascertainable.  DE 64, pp. 10-11.  Specifically, PNC argues that "determine[ing] membership" in that class will require the Court to "individually determine" whether the DFI approved the GAP fees charged to

members of the class who entered into their GAP agreements prior to July 1, 2018. *Id.*[7]  As noted

above, for contracts entered into before July 1, 2018, fees for GAP were not a permitted "additional

charge" unless the DFI approved the GAP program, including the GAP addendum form, sold to

the customer (approved a blank version of the form, not the customer's filled-out form).

 PNC's argument fails because ascertainability requires only that (i) the class be "clearly

defined, and (ii) membership be defined by objective criteria."  *Mullins*, 795 F.3d at 657.  The

Excessive Fee Class meets the criteria because it is (a) "defined clearly" to include only those

customers who were charged GAP fees not approved by the DFI, and (b) whether the DFI gave

such approval is an "objective criteria."  *Id.*

 Further, if PNC or the original selling dealer (or their agents) obtained DFI approval for a

GAP agreement, then such entities should have records reflecting that approval, and Plaintiff is

entitled to seek them in discovery.  The DFI should also have records of any GAP agreements that

it approved.  Therefore, while Plaintiff does not have "to prove at the certification stage that there

is a 'reliable and administratively feasible' way to identify all who fall within the class definition,"

business records will undoubtedly exist to identify those customers whose GAP agreement forms

were not approved by the DFI.  *Mullins*, 795 F.3d at 657.  Such records will make identification of

the members of the Excessive Fee Class a ministerial and non-controversial task.  But even if

identifying class members turns out to be "challenging" this Court would be required to "consider

the alternatives" before denying class certification.  *Mullins*, 795 F.3d at 664.  The Seventh Circuit

has further instructed that the alternative the Court "normally should" adopt in that situation is to

"wait and see how serious the problem may turn out to be after settlement or judgment, when much

---

[7] PNC has not proffered any evidence regarding (i) the number of dealers from whom it accepted assignment of finance agreements with GAP agreements prior to July 1, 2018, or (ii) the number of GAP administrators affiliated with those GAP agreements.  Therefore, estimating the amount of discovery likely to be necessary to identify the Excessive Fee Class members is not even possible at this juncture.

more may be known about available records, response rates, and other relevant factors." *Id.* "And if a problem is truly insoluble, the court may decertify the class at a later stage of the litigation." *Id.* In sum, it is premature to determine this issue at the pleading stage.

> **b)** **PNC Improperly Relies on Extrinsic Evidence But the Evidence Actually Proves Plaintiff's Allegation**

In an effort to defeat class certification of the Excessive Fee Class at the pleading stage, PNC relies principally on documents it obtained from the DFI in response to a Public Records Act. DE 64, p. 11; DE 65-1 through 65-9. PNC's Public Records Act request sought all applications and approvals to sell GAP by the GAP administrator for Plaintiff's GAP agreement (Customer Service Center, Inc. – "CSC") and by Plaintiff's original selling dealer (Christensen Chevrolet). DE 65-1. Plaintiff objects to the Court considering those documents in connection with PNC's motion to strike. Under the "majority view" in the Seventh Circuit, motions to strike are limited to the "facial plausibility of the class as alleged in the complaint." *See, e.g., Lukis v. Whitepages Inc.*, 535 F. Supp. 3d 775, 795 (N.D. Ill. 2021) (collecting cases). "[M]atters outside the pleadings" – such as the documents proffered by PNC – are not properly considered. *Id.*

But even if the Court considers the documents PNC obtained from the DFI,[8] the documents show that neither CSC or Christensen Chevrolet obtained DFI approval for the GAP program and GAP agreement sold to Plaintiff.[9] PNC's argument that the DFI "produced documents showing that DFI [sic] approved CSC's GAP program and that CSC applied to the DFI for renewal of the approval in each year of 2014 to 2017" is extraordinarily misleading, at best. The documents show that CSC did <u>not</u> seek or obtain approval for Plaintiff's GAP program and GAP agreement form

---

[8] PNC has submitted only some of the documents that it obtained from the DFI. If the Court considers the documents submitted by PNC – which it should not do – the Court should consider the DFI's entire production. The DFI's entire production is attached to the Declaration of Scott H. Sims ("Sims Decl.") filed concurrently.

[9] PNC does not contend that it sought or obtained DFI approval for Plaintiff's GAP program and agreement.

but instead sought and obtained approval for a *different* GAP program and *different* GAP agreement forms with *different* terms.

Specifically, based on the documents, CSC applied for and received DFI approval for a GAP program with two GAP agreement forms, which could be sold for a maximum cost of $420.00. Sims Decl., Ex. A at Bates Nos. 000005, 000010-000042, 000139.

> 30.)  Customer Service Center, Inc. is requesting approval as third party administrator for a Guaranteed Auto Protection (GAP) Program. Applicant is based in Kalamazoo, MI. There is a contractual liability policy issued by Stonebridge Casualty and American General Indemnity. The initial dealer requesting approval is Auburn Chrysler-Dodge-Jeep. The maximum cost to the customer is $420.00. The customer deductible is covered up to $1,000. Free look period is 60 days. Refund upon prepayment is Rule of 78s. All future dealers will agree to abide by the same terms as those approved. The Department subject to review at a future date as deems necessary. It is recommended that the program be approved as submitted and subject to the above conditions. This is provided for under IC 24-4.5-2-202(1)(c). **The Director approved this on July 29, 2003, under delegated authority subject to the above conditions.**

That GAP program and those GAP agreements are different than the program and agreement sold to Plaintiff. *Id.*, at Bates Nos. 000023-000026. For example, as the DFI's production confirms, the DFI's policy was that it would not approve GAP agreements that included cancellation fees.

> 20. GAP cancellation fees are not authorized in Indiana and cannot be part of the GAP agreement.

Sims Decl., Ex. A at Bates Nos. 000062; *see also* DE 46-1, p. 7.

Consistent with the DFI's requirement, the GAP agreement forms submitted by CSC and approved by the DFI did <u>not</u> include cancellation fees. Sims Decl., Ex. A at Bates Nos. 000023-000026. In contrast, Plaintiff's GAP agreement included a $35 cancellation fee. DE 56-4. Here are the applicable portions of those two agreements, making that distinction clear:

///

///

*Plaintiff's GAP Agreement*

> This GAP Waiver Addendum must be sold on the same day as the Installment Sales Contract / Lease Agreement was executed and may be canceled for a full refund within sixty (60) days of the Origination Date. However, in the event of a Total Loss, Constructive Total Loss or Unrecovered Theft of the covered Vehicle, the GAP Waiver Addendum fee will be deemed as fully earned and therefore, no refund will be due. After sixty (60) days from the Origination Date, any refund will be calculated using a pro-rata method unless otherwise required by state regulatory laws, less a $35 cancellation fee.

*CSC GAP Agreements Approved by the DFI*

> This Installment Sales Contract/Loan/Lease GAP Waiver Addendum may be canceled for a full refund within sixty (60) days of the Origination Date. However, in the event of a Total Loss, Constructive Total Loss or Unrecovered Theft of the covered Vehicle, the GAP Waiver Addendum fee will be deemed as fully earned and therefore, no refund will be due. After sixty (60) days from the Origination Date, any refund will be calculated by a pre-determined formula.

Further, (i) the full cost of the GAP coverage under Plaintiff's agreement is $506.00, which is above the $420.00 maximum cost approved by the DFI for the GAP programs submitted by CSC, and (ii) Plaintiff's GAP agreement provides refunds will be calculated under the pro-rata method, not the Rule of 78 method approved by the DFI. *Compare* DE 56-4 with Sims Decl., Ex. A at Bates Nos. 00005, 000139. This once again shows that Plaintiff's GAP program and agreement was <u>not</u> one of the forms approved by the DFI.

The documents produced by the DFI also show that CSC submitted renewal applications to the DFI. Sims Decl., Ex. A at Bates 000044-000116, 000145-000215. The DFI's renewal applications required CSC to submit any "new or revised customer GAP agreements" to "the DFI for approval prior to using them" (among other things). *Id.*, Bates No. 000062.

> 22. Any new or revised customer GAP agreements must be submitted to the DFI for approval prior to using them. No changes are permitted that increase the maximum customer cost for the program as approved by DFI. There can be no decrease in benefits. Reasons for the changes in the form, as well as a sample of the proposed new form, must be submitted. All proposed changes must be identified on the form by red-line, highlight, or other edit identification means.

CSC's renewal applications included three GAP agreement forms, but none of them are the GAP agreement sold to Plaintiff. *Compare* DE 56-4 with Sims Decl., Ex. A at Bates Nos. 00044-000045, 000084-000085, 000183-000184. They contain different terms. For example, the submitted forms do <u>not</u> have a cancellation fee provision (Plaintiff's agreement does) and/or use

24

the Rule of 78 method for calculating refunds (Plaintiff's agreement uses the pro-rata method). *Id.*

Thus, the documents actually show that that none of CSC's renewal applications resulted in CSC obtaining approval for Plaintiff's GAP program and GAP agreement form.

Likewise, based on the DFI's production, Christensen Chevrolet never submitted a GAP approval application to the DFI. Christensen Chevrolet was registered (not licensed) with the DFI, as reflected in the DFI's production and on the DFI's website. Sims Decl., Ex. A at Bates No. 000220 and Ex. B at pp. 2-3. But as DFI's general counsel confirmed in an email to PNC's counsel, the "documents make no reference to GAP."[10] Sims Decl., Ex. B. Christensen Chevrolet's failure to seek approval from the DFI is unsurprising, as Plaintiff's current understanding is that GAP administrators, not dealers or financial institutions, were generally the party that sought DFI approval for a GAP program and agreement, if any such approval was sought.

### C.    The Existence of Arbitration Agreements Will Not Defeat Class Certification

The potential existence of arbitration agreements signed by some currently unknown number of putative class members does <u>not</u> provide grounds to strike Plaintiff's class allegations. That is the case for at least four reasons.

First, "if there are absent class members who agreed to arbitrate their disputes" then PNC can, "if it wishes, move to compel arbitration as to those individuals after class certification." *Fischer v. Instant Checkmate LLC*, No. 19 C 4892, 2022 WL 971479, at *9 (N.D. Ill. Mar. 31, 2022); *see also Garcia v. JCPenney Corp., Inc.*, No. 12-CV-3687, 2016 WL 878203, at *7 (N.D. Ill. Mar. 8, 2016) (holding "the sensible course in this case is to decide whether to certify the class without considering the possibility of arbitration and then allow JCPenney, if it so chooses, to file

---

[10] CSC appears to have obtained approval, as part of its 2014-2017 renewal applications, for Christensen Chevrolet to sell the CSC GAP program and GAP agreement forms approved by the DFI. Sims Decl., Ex. A at Bates Nos. 000197, 000220 and Ex. B, p. 3. But as set forth above, the approved program and forms differ from what was sold to Plaintiff by Christensen Chevrolet and then assigned by Christensen Chevrolet to PNC.

its motion to compel arbitration.)

Two, "discovery will elucidate exactly which and how many putative class members agreed to arbitrate." *Heredia v. Sunrise Senior Living LLC*, No. 818CV01974JLSJDE, 2019 WL 5149854, at *6 (C.D. Cal. Mar. 4, 2019). PNC offers no evidence regarding how many different agreements will need to be reviewed by the parties to determine who signed arbitration provisions. PNC has thus not even established that will be a time-consuming task. But regardless, PNC can produce a list of its customers who signed arbitration agreements and produce the agreements so Plaintiff can verify the accuracy of that list.[11] That will not be a task for the Court because whether a customer's finance agreement or GAP agreement (both of which are template forms) contains an arbitration agreement is an objectively identifiable fact. After that discovery is complete and Plaintiff has identified who signed an arbitration provision, Plaintiff may, as part of his motion for class certification, decide to "adjust [his] class definition" to exclude such individuals. *Id.*

The possibility that Plaintiff's motion for class certification will narrow the class to exclude individuals with arbitration agreements does not provide grounds to strike the class allegations. Even if it is "likely" that Plaintiff will need to later exclude individuals who signed arbitration agreements from the class, the motion to strike should still be denied. *Dietrich*, 2018 WL 6399199, at *1. The cases cited by PNC do not provide otherwise. PNC does not cite a single case where the Court struck class allegations at the pleading stage based on some absent class members having entered into arbitration agreements. Every single case cited by PNC was either decided at the

---

[11] The footer of the finance agreements and GAP Addendums generally contain "form numbers." *See, e.g.*, DE 35-1, p. 2; DE 35-2 at p. 2. If discovery reveals that PNC maintains a record of which customer has which forms, the parties will be able to identify which customers signed finance agreements/GAP Addendums with an arbitration provision by making a list of the forms containing such a provision and cross-referencing it against PNC's records. Modern technology, such as optical character recognition ("OCR") is also likely to assist if necessary, by, for example, allowing the parties to search finance agreements or GAP Addendums for the numbers or for the word "arbitration."

certification stage or struck the class allegations on grounds the named plaintiff (not absent class members) had entered into an arbitration provision and class action waiver.  Further, numerous cases cited by PNC hold that if arbitration agreements signed by absent class members become an issue the appropriate course is to narrow the class to exclude such persons, rather than to deny class certification altogether.  *See In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 863 (D. Md. 2013); *Robinson v. OnStar*, LLC, No. 15-cv-1731, 2020 WL 364221, at *17 (S.D. Cal. Jan. 22, 2020); *Nat'l Convention Servs., LLC v. Applied Underwriters Captive Risk Assurance Co.*, No. 15-cv-7063, 2019 WL 3409882 at *4 (S.D.N.Y. July 27, 2019).

The proper course here is therefore to deny the motion to strike and permit discovery regarding which putative class members signed arbitration agreements.  That will give Plaintiff the option, as part of his class certification motion, to exclude those individuals from the classes he ultimately seeks to certify.  And, if Plaintiff chooses not to exclude them from the class definitions, PNC can, "if it wishes, move to compel arbitration as to those individuals after class certification."  *Fischer*, 2022 WL 971479, at *9.

> **D.    Determining Which GAP Agreements Have Cancellation and Termination Provisions Substantially Similar to Plaintiff's GAP Agreement is not Grounds to Strike the Class Allegations**

Plaintiff's Breach of Contract Class is limited to customers whose GAP agreements contained substantially similar cancellation and termination provisions obligating PNC to refund unearned GAP fees in the event of an early payoff.  The need to determine which GAP agreements meet that criteria is not grounds to strike the Breach of Contract Class allegations.  PNC's argument to the contrary is based on its contention that this Court will have to conduct "extensive individualized inquiries'" of customer GAP agreements.  DE 64, p. 15.  PNC's argument fails for multiple reasons.

First, as part of discovery, PNC will produce the GAP agreements of the customers who are potential members of the Breach of Contract Class.  Plaintiff will analyze the GAP agreements and determine which ones contain substantially similar cancellation and termination provisions obligating PNC to refund unearned GAP fees in the event of an early payoff.  Then, as part of his class certification motion, Plaintiff will specify the GAP agreements by the GAP administrator and the form number in the footer of the agreement.[12]  Only PNC's customers with those GAP agreements will be included in the Breach of Contract Class.  When that is done, there may be little or no disagreement among the parties regarding which agreements are substantially similar.  But regardless, striking the class allegations would improperly deny Plaintiff that discovery.

Second, PNC's motion offers no explanation regarding why it would be an "extensive" task for this Court to determine if GAP agreements contain substantially similar cancellation and termination provisions .  Those provisions are generally only one or two paragraphs each.  Further, PNC has not identified how many different versions of GAP agreements were signed by its customers.  Thus, there is no basis to assume that reviewing numerous GAP agreements to make the requisite determination of similarity would be an especially arduous task.

Third, even assuming, *arguendo*, that this Court would need to conduct an "extensive" review of numerous GAP agreements when ruling on Plaintiff's motion for class certification, that is not grounds to strike the class allegations.  The Court will rule on class certification based on whether Plaintiff has satisfied the elements of Rule 23.  The Court could not and would not deny class certification on grounds that determining whether Plaintiff has satisfied the elements of Rule 23 will be a time-consuming task for the Court.  As this Court stated at the hearing on PNC's last motion to dismiss, the Court has an "obligation to roll up [its] sleeves" and "do what [it has] to

---

[12] For example, Plaintiff will identify his GAP agreement as Customer Service Center, Inc. (the GAP administrator) form with the form number "CSCI-AC (5/09)" which is found in the bottom left of the footer.  DE 56-4.

do." Declaration of Scott H. Sims, Ex. C at 39:13-20." The argument that "it's going to be a lot of work" for the Court to decide whether Plaintiff has satisfied Rule 23, or for the parties to litigate that issue, is not grounds to deny class certification. *Id.*

Fourth, the two cases cited by PNC have no applicability here. In each of those cases, a determination on the merits would have involved individualized inquiries into dissimilar provisions of numerous different written instruments (e.g., insurance policies and property right transfer documents). *See Isaacs v. Sprint Corp.*, 261 F.3d 679, 682 (7th Cir. 2001); *Cima v. WellPoint Health Networks, Inc.*, 250 F.R.D. 374, 382 (S.D. Ill. 2008). Here, in contrast, the members of the Breach of Contract Class will all have GAP agreements with substantially similar cancellation and termination provisions. Thus, individual issues will not predominate and instead any individual issues will be manageable.[13]

### E.   PNC's "Joinder" Argument is not Well Taken

PNC argues that GAP administrators or dealers may need to be joined as parties in this case, and that would make the case unmanageable. DE 64, pp. 16-17. The basis of PNC's argument is its contention that the "individual third-party dealers and GAP administrators are the entities that collected the fees for the GAP products and that hold such fees." *Id.* PNC's contention ignores Plaintiff's express allegation – which is obviously correct – that the "customer pays [the GAP fees] incrementally over time *to PNC* on a month-to-month basis" as part of their standard monthly payments. DE 56, ¶ 12 (emphasis added); *see also* DE 56, ¶ 48(f).

When PNC purchases a finance agreement from a dealer, it steps into the shoes of the dealer and takes over the contractual obligations as the assignee. 16 C.F.R. § 433.29(a) ("Any holder of a consumer credit contract is subject to all claims and defenses which the debtor could assert

---

[13] To the extent Plaintiff identifies a GAP agreement as being substantially similar but PNC and the Court both disagree, customers with that GAP agreement could be excluded from the Breach of Contract Class.

against the seller . . .")  This rule is known as the "Holder Rule."  *Hernandez v. Apple Auto Wholesalers of Waterbury LLC*, 2022 WL 4593104, at \*12 (D. Conn. Sept. 30, 2022) ("The clear and unambiguous language of the Rule notifies all potential holders that, if they accept an assignment of the contract, they will be 'stepping into the seller's shoes.'") (citing *Associates Home Equity Servs., Inc. v. Troup*, 778 A.2d 529, 542-43 (NJ. App. 2001) *see also Lozada v. Dale Baker Oldsmobile, Inc.*, 91 F.Supp.2d 1087, 1094-95 (W.D. Mich. 2000); *Oxford Finance Companies, Inc. v. Velez*, 807 S.W.2d 460, 463 (Tx. App. 1991).)

As alleged in the SAC, upon assignment, the only parties to the GAP agreement are PNC and the customer.  DE 56, ¶¶ 6, 11, 17.  Thus, PNC is the only party to whom the customer pays GAP fees and is the only countervailing party to the GAP agreement that owes the GAP refund obligation to the customer.  *Id.*; *see also Transp. Fact., Inc. v. Pac-Paper, Inc.*, 885 F.2d 875, 1989 WL 107823, at \*1 (9th Cir. 1989) ("It is hornbook law in every jurisdiction that an assignment merely places the assignee [] in the assignor's [] shoes."); 16 C.F.R. § 433.2(a) (the "holder" of the finance agreement and GAP addendum (PNC) is subject to any claims that could have been asserted against the assignor (the dealer).)  As such, there is no basis to join dealers or GAP administrators.  They are not parties to the contract with the customer, and they do not owe the contractual obligations to the customer.  *Id.*

In addition to ignoring Plaintiff's allegation, PNC's motion fails to engage in any analysis of the requirements for joinder because it cannot satisfy those requirements.

First, permissive joinder under Federal Rule of Civil Procedure 20 would not be proper. Permissive joinder requires that the plaintiff assert a right to relief against the parties proposed to be joined (here the GAP administrators and dealers), which Plaintiff has not done.  *Intercon Rsch. Assocs., Ltd. v. Dresser Indus.*, Inc., 696 F.2d 53, 57 (7th Cir. 1982) (permissive joinder of

defendants requires that "a right to relief must be asserted by the plaintiff against each defendant relating to or arising out of the same transaction or series of transactions"). Permissive joinder would also be properly denied on grounds it would be fundamentally unfair for PNC to join dealers or GAP administrators and then use its decision to join those entities as grounds to oppose class certification. *Chavez v. Illinois State Police*, 251 F.3d 612, 632 (7th Cir. 2001) (permissive joinder is properly denied where it would not "comport with the principles of fundamental fairness").

Second, compulsory joinder of dealers or GAP administrators under Federal Rule of Civil Procedure 19 would be improper. PNC may have separate agreements with dealers or GAP Administrators that require such entities to indemnify PNC for GAP refunds that PNC issues. But "a party does not become a required party for joinder purposes under Federal Rule of Civil Procedure 19 simply by virtue of indemnifying one of the named parties." *Lewis v. Clarke*, 581 U.S. 155, 167 (2017); *see also Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 313, 315, 320 (3d Cir. 2007) ("a defendant's right to contribution or indemnity from an absent non-diverse party does not render that absentee indispensable pursuant to Rule 19.").

Finally, even if joinder of GAP administrators or dealers would be legally permissible, it would not be grounds to strike the class allegations. Plaintiff, to be blunt, does not think PNC would ever actually move to join hundreds of entities. But if PNC files such a motion, the parties can litigate that motion in due course and, if joinder is permitted, litigate the effect of such joinder on class certification. But given that no such motion has been filed or granted, PNC's effort to strike the class allegations on grounds of potential joinder should be rejected.

## V.     CONCLUSION

Based on the foregoing, Plaintiff requests that PNC's Motion be denied. Alternatively, Plaintiff requests thirty (30) days leave to amend to address any issues raised by the Court.

Dated:  October 20, 2023                    By:_____/s/ *Scott H. Sims*_____
                                            Jason M. Frank (*pro hac vice*)
                                            Scott H. Sims (*pro hac vice*)
                                            FRANK SIMS & STOLPER LLP
                                            19800 MacArthur Blvd., Suite 855
                                            Irvine, CA 92612
                                            Telephone: (949) 201-2400

                                            ssims@lawfss.com
                                            jfrank@lawfss.com

                                            Robert W. Rock (Ind. Bar No. 14060-48)
                                            Franklin D. Azar (*pro hac vice*)
                                            FRANKLIN D. AZAR & ASSOCIATES, P.C.
                                            14426 East Evans Avenue
                                            Aurora, CO 80014
                                            Telephone: (303) 757-3300
                                            rockr@fdazar.com
                                            azarf@fdazar.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that, on October 20, 2023, a copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

_/s/ Scott H. Sims_
Scott H. Sims