UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| VINCENT I. RATULOWSKI, on behalf of himself and all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Cause No. 2:22-CV-004-PPS-APR |
| PNC BANK, N.A., d/b/a PNC AUTO FINANCE, | ) ) ) | |
| Defendant. | ) ) | |

**<u>OPINION AND ORDER</u>**

Plaintiff Vincent Ratulowski claims that PNC Bank knowingly collects and unlawfully retains unearned insurance fees that are sold as an add-on to automobile finance agreements. In his Second Amended Complaint [DE 56], Ratulowski asserts four legal claims: one for breach of the written terms of his auto finance agreement (Count I); two for violations of Indiana's Uniform Consumer Credit Code (Counts II–III); and finally, under an equitable concept known as "money had and received" (Count IV). Ratulowski also brings class claims on behalf of three putative classes. PNC has moved to dismiss Counts II–IV and to strike the class allegations from the complaint. [DE 61; DE 63.]

For the reasons explained below, the motion to dismiss will be granted and the motion to strike will be denied.

## Background

This is a case about "GAP fees"—shorthand for "Guaranteed Asset Protection" fees—and a creditor's legal obligation to remit any such fees paid by a customer but "unearned" by the creditor. Ratulowski claims that he and members of three putative classes were injured when they paid off their car loans early, resulting in PNC obtaining "unearned GAP fees" that PNC did not refund. I previously summarized his detailed factual allegations in an Opinion and Order granting in part PNC's motion to dismiss the First Amended Complaint, and I assume the parties' familiarity with that decision. [DE 53.] While the underlying allegations are essentially identical, as I'll explain in a moment, Ratulowski now asserts claims based on several new legal theories that were not presented in the First Amended Complaint.

As I did in my original order dismissing the complaint in part, let's start by briefly discussing the concept of "GAP fees." The typical vehicle finance agreement, like the one at the center of this case, is a contract under which the customer agrees to pay an auto dealer the price of a vehicle over a fixed period of time, with interest, through installment payments. Dealers then sell and assign those contracts to other entities (in this case, PNC's auto finance company), and the payments are made directly from the customer to the finance company. The basic idea behind GAP insurance is premised on the idea that most new cars rapidly depreciate as soon as they are driven off the lot. Suppose that someone buys a new car for $30,000 and finances all of it. Suppose further that he drives the car for a few months, puts 10,000 miles on it, and then gets in an

accident and totals it. He still would owe nearly $30,000 on the car to the bank that financed the deal; but the value of the vehicle at the time it was totaled might be only $25,000. The auto insurer will only pay for the value of the car at the time it was totaled – $25,000 in my example. And the owner will have to make up the difference ($5,000) to fully pay off the lender. GAP insurance is an add-on coverage offered at the time of the sale that, as the name suggests, bridges the gap between what a car is worth and what one still owes on it if the car gets totaled or stolen.

In December 2015, Vincent Ratulowski financed the purchase of a 2016 Chevrolet Cruze from a dealer in Highland. [DE 56, ¶ 26.] The terms of financing were set forth in a "Retail Installment Contract and Security Agreement" governed by the law of Indiana and applicable federal laws and regulations – which I will refer to as his "finance agreement." The finance agreement obligated Ratulowski to repay the full amount financed in 75 monthly installments, starting January 10, 2016, and gave him the option to "prepay this Contract in full or in part at any time." [*Id.*, ¶¶ 26–27; DE 56-3 (Finance Agreement) at 3.] At the same time he financed the purchase of his Chevy Cruze, Ratulowski elected to buy GAP coverage. To that end, the finance agreement listed $506.00 for "GAP Protection" under "insurance premiums paid to insurance company(ies)," and included this amount in the "amount financed" by Ratulowski at the time of purchase. This agreement was memorialized in a "GAP Waiver Addendum Election Form" appended to the finance agreement. [DE 56-4 (GAP Addendum).]

The GAP Addendum stated the total amount financed, the interest rate, and

installment term, and included a box (which Ratulowski checked) titled "Yes, I elect the GAP Waiver." *Id.* at 2. The document lists "Customer Service Center, Inc.," with an address in Kalamazoo, Michigan, as the "GAP Administrator," while PNC is listed as the "Financial Institution/Lender." *Id.* After he executed the finance agreement and GAP Addendum, Ratulowski claims these agreements were then "assigned to PNC." [DE 56, ¶ 28.] As described above, the GAP Addendum provides protection to a customer in the event the vehicle is totaled and an insurance payout does not cover the remaining amount the customer owes under a finance agreement. By checking the box on the GAP Addendum, Ratulowski purchased the GAP coverage, meaning that if a total loss of this type occurred (a "GAP event"), the creditor (ultimately, PNC) would waive the difference Ratulowski would otherwise owe.

In April 2020, Ratulowski traded in his Chevy Cruze to a new dealer, Gateway Motors, Inc., in Broken Bow, Nebraska. [DE 56, ¶ 32; *see* DE 56-5.] As is customary, Gateway Motors asked PNC what the payoff amount was. When PNC responded, it included in Ratulowski's early payoff quote the remaining amount of GAP fees for the full original term of the finance agreement. He then brought his Chevy Cruze to the dealership and authorized Gateway Motors to "make the payment to PNC on his behalf." Upon receipt of the payment from Gateway Motors, Ratulowski authorized PNC to "transfer title to the vehicle" to the dealer. [DE 56, ¶ 33.] While Gateway Motors made the payments directly to PNC, Ratulowski avers that he "did <u>not</u> transfer or assign his right to a refund of unearned GAP fees to Gateway Motors," and "merely

authorized PNC to release the vehicle's title to Gateway Motors upon receipt of his early payoff." *Id.*, ¶ 38. After Ratulowski signed the payment authorization, Gateway Motors evidently paid off the outstanding amount directly to PNC, and PNC provided Gateway Motors with title to the Chevy Cruze – while one could attempt to mince the separate steps in the process, they were really part-and-parcel of the same trade-in transaction.

What all this means is that Ratulowski unwittingly paid PNC unearned GAP fees in the amount of $156.99, excluding interest. [*Id.*, ¶¶ 32–34; *see* DE 56-4; DE 56-5.] And this occurred because, according to Ratulowski, the payoff number that PNC provided to Gateway Motors was phony. Instead of refunding the unearned GAP fees (or subtracting them from the payoff amount), PNC allegedly lumped the unearned GAP fees in with the remaining principal and interest balance, thereby obscuring what was actually owing on the car. [DE 56, ¶ 32 (PNC "secretly included an overcharge" in the payoff amount).]

In his First Amended Complaint, Ratulowski asserted a claim for breach of contract and "money had and received," and he tacked on a request for declaratory judgment that PNC had unlawfully kept his (and putative class members') unearned GAP fees. [DE 26.] He also asserted claims on behalf of a six-state class and an Indiana subclass. *Id.*, ¶¶ 34–35, 49–79. PNC moved to dismiss the complaint and strike the class and subclass. [DE 31; DE 33.] After sorting through the relevant language in Ratulowski's finance agreement and GAP Addendum, I determined that he plausibly

alleged that PNC breached the GAP Addendum's express termination or cancellation provisions by failing to automatically refund the GAP fees he paid as part of his early payment of his finance agreement. [DE 53 at 24.]

Ratulowski also asserted his breach of contract claim based on an "implied term" in the agreements imposed by Indiana law – which he broadly termed Indiana's "Automatic Refund Law." But because state law in effect at the time Ratulowski entered the contract did not require automatic refunds of GAP fees upon early prepayment of a finance agreement, this theory failed to state a plausible claim for relief and was therefore dismissed. *Id.* at 16–20. Because Ratulowski was allowed to proceed on his claim for breach of the express terms of his finance agreement and GAP Addendum and failed to identify any provision in Indiana law violated by PNC's alleged practices, he could not proceed on his parallel equitable claim for "money had and received." *Id.* at 27–28. Finally, his declaratory relief count was duplicative of the breach of contract claim and accordingly dismissed. *Id.* at 29.

Ratulowski previously sought to certify a "Multi-State Class" consisting of persons who entered into auto finance agreements with GAP Addendums (and "assigned to PNC") in one of six "Automatic Refund States" while such laws were in effect and who did not receive a credit or refund of unearned GAP fees, as well as an "Indiana Subclass" consisting of all such persons who did so while Indiana's "Automatic Refund Law" was in effect and who did not receive a credit or refund of unearned GAP fees. [DE 26, ¶ 14, 34–35.] Both of these putative classes were defined to

include only those individuals who entered into finance agreements while the applicable state laws were in effect. Because Ratulowski failed to state a claim for breach of contract based on an implied term imposed by Indiana's Automatic Refund Law, he lacked standing to proceed as a representative of his proposed classes. For this reason, I granted PNC's motion to strike the class claims, noting that with another round of pleading Ratulowski may seek to "narrow them to similarly situated individuals who bought similar GAP coverage, as [he] did in Indiana." [DE 53 at 33–36.]

In the Second Amended Complaint, Ratulowski renews his claim for breach of the express terms of his finance agreement and GAP Addendum (Count I), and seeks to assert claims on behalf of a "breach of contract" class consisting of Indiana customers who entered agreements with substantially similar terms. [DE 56, ¶¶ 40, 56–70.] Additionally, unsatisfied with my prior ruling that Indiana law in place when he financed the purchase of his car in December 2015 did not require PNC to automatically refund the GAP fees he seeks to recover, he now alleges alternative hooks on which to hang his claims. In that regard, Counts II and III, as noted above, assert new legal theories based on alleged violations of Indiana's Uniform Consumer Credit Code ("UCCC").

Initially, Count II asserts a claim for violation of Ind. Code § 24-4.5-1-102(7). That provision states that any violation of federal law applicable to consumer credit transactions is also a violation of the UCCC. *Id*. Ratulowski's theory is that the UCCC is being violated because PNC's practice of collecting unearned GAP fees runs afoul of the

federal Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Consumer Protection Act") because it constitutes an "unfair deceptive, or abusive act or practice" under 12 U.S.C. § 5536(a)(1)(B). He also seeks to proceed on this claim on behalf of an "unfair business practice" class. [DE 56, ¶¶ 41, 71–85.] In Count III, Ratulowski asserts that the version of the UCCC in place prior to July 1, 2018 required all GAP fees to be pre-approved by the Indiana Department of Financial Institutions ("DFI"). He seeks to assert a claim on behalf of an "excessive fee" class consisting of Indiana customers charged for unearned GAP fees that were not approved by DFI. *Id.*, ¶¶ 42, 86–89. Finally, in light of his new claims based on violations of the UCCC, Ratulowski renews his class and individual claims for "money had and received." *Id.*, ¶¶ 90–94.

PNC seeks dismissal of the new claims, asserting that: (1) the UCCC claims fail as a matter of law because they are barred by the applicable statute of limitations [DE 62 at 11–14]; (2) Ratulowski does not plausibly allege a violation of federal law supporting Count II [*id.* at 14–16]; (3) he cannot plausibly allege that he made a pre-suit demand for a refund or paid an excess charge, as required for a violation of the UCCC [*id.* at 16–18]; and (4) his equitable claim fails for several reasons [*id.* at 19–20]. PNC also seeks to strike the class allegations from the complaint. [DE 63; DE 64; DE 65.]

## Motion to Dismiss

Rule 12(b)(6) permits a party to move for dismissal if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(1), 12(b)(6). To avoid dismissal under Rule 12(b)(6), a claim for relief must be "plausible on its face." *Proft v.*

8

*Raoul*, 944 F.3d 686, 690 (7th Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility requires the plaintiff to plead sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Taha v. Int'l Brotherhood of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Seventh Circuit has explained that the plaintiff must plead facts that "suggest a right to relief that is beyond the speculative level," which requires alleging "enough details about the subject-matter of the case to present a story that holds together." *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

I.     **Ratulowski's UCCC Claims are Time-Barred**

The first bundle of claims arise under the UCCC, so I'll take a quick spin through the applicable statutory provisions to put the parties' arguments in context. In July 2018, the Indiana General Assembly amended then-existing law to provide that "the seller of [a] GAP agreement is responsible for making a timely refund to the customer of unearned GAP agreement charges under the terms and conditions of [a] GAP agreement" and must "issue a refund" upon the termination of a GAP agreement or upon early prepayment. *See* Ind. Code §§ 24-4.5-2-202(4)(f), (g)(ii). The 2018 amendments to the statute specifically regulate refunds upon prepayment of an auto finance agreement. The current version of the law is crystal clear: a creditor in the business of selling GAP coverage is obligated to "issue a refund" when a consumer

pays off their finance agreement early and "the GAP coverage is automatically terminated." *Id.* § 24-4.5-2-202(g)(i)–(ii).

The issue for Ratulowski is that this provision came into effect several years *after* he executed his finance agreement and GAP Addendum in December 2015. [*See* DE 53 at 16.] In his First Amended Complaint, Ratulowski attempted to side-step this issue by relying on informal guidance issued by the Department of Financial Institutions, asserting that DFI rules in place by December 2015 created an obligation to automatically refund unearned GAP fees. But as I explained, the agency's guidance was not promulgated as a formal rule carrying "the effect of law," such that it could create an implied term in the parties' agreements. *See id.* at 20 (citing Ind. Code § 4-22-2-13-(c)(1)). So that theory was a non-starter.

Undeterred, Ratulowski has traded in his old theory for some new ones. The new vehicle for his claims is Indiana Code § 24-4.5-5-202. This provision lays out remedies for UCCC violations and is appropriately titled "Effects of violations on the rights of parties." Subsection (3) provides that a "debtor is not obligated to pay a charge in excess of that allowed by" the statute; and "if the debtor has paid an excess charge the debtor has a right to a refund." Ind. Code § 24-4.5-5-202(3). Subsection (4) states that "[i]f a debtor is entitled to a refund and a person liable to the debtor refuses to make a refund within a reasonable time after demand," the debtor can obtain "a penalty." *Id.* § 24-4.5-5-202(4) (providing statutory penalties up to ten times the excess charge).

One is left to wonder – what constitutes an "excess charge" that may trigger a debtor's "right to a refund" under Subsection (3)? Ratulowski claims that PNC's practices constitute unlawful "excessive" charges in two distinct ways. First, under Indiana Code § 24-4.5-1-102(7), a violation of "a state or federal law, regulation, or rule applicable to consumer credit transactions" is also a violation of the UCCC. In Count II, he asserts that collecting and failing to automatically refund unearned GAP fees violates federal law – namely, Sections 5531(a), (c), and 5536(a)(1)(B) of the Consumer Protection Act.[1] Count III, by contrast, harkens back to the old version of the UCCC in effect when Ratulowski executed the agreements in December 2015. At that time, a charge for GAP coverage was permitted only if "reasonable in relation to the benefits," and only if "excluded as [a] permissible additional charge[] from the credit service charge." The law further provided that a "seller must submit a written explanation of the charge to [the Department of Financial Institutions] indicating how the charge would be assessed and the value or benefit to the consumer. Then, DFI "shall determine whether the charge would be of benefit to the consumer and is reasonable in relation to the benefits." Ind. Code § 24-4.5-2-202(1)(c) (eff. prior to July 1, 2018). [*See generally* DE 56-2 at 2–5 (reflecting changes made by amendment effective July 1, 2018).] Because DFI did not approve the GAP fees Ratulowski was charged, he argues, they are

---

[1] A centerpiece of Congress's effort to overhaul financial regulation in the aftermath of the financial crisis of 2007–2008, the Consumer Protection Act amended numerous aspects of federal law. Among many other things, the law provides that it is unlawful for "covered person" to "engage in any unfair deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B). While the Consumer Protection Act makes no mention of GAP products or fees, Ratulowski presses that it applies broadly to "consumer credit transactions," and that PNC's actions constitute "unfair deceptive, or abusive" business practices.

unauthorized "additional charges" under the old version of Section 24-4.5-2-202(1)(c),
and thus "excessive" charges for purposes of Section 24-4.5-5-202.

PNC's principal argument for dismissal of Counts II and III is that both of the
new UCCC claims are subject to a one-year statute of limitations that commenced in
April 2020, when Ratulowski made an early payoff on his finance agreement while
trading in his Chevy Cruze, and are thus time-barred. Ratulowski tells me that PNC
misreads the applicable UCCC provisions and that he should be permitted to file his
claims at any point within ten years after his early payoff. *See* Ind. Code § 34-11-1-2(a).
After reviewing the applicable authorities, I conclude that Ratulowski's UCCC claims
are subject to the one-year statute of limitations codified in Indiana Code § 24-4.5-5-
202(4), and are therefore untimely filed.

My task is to untangle competing interpretations of a statute – a matter "well
within the judiciary's competence." *See Hively v. Ivy Tech Cmty. Coll. of Indiana*, 853 F.3d
339, 343–44 (7th Cir. 2017) (outlining traditional methods of statutory interpretation). In
construing a state statute, I must "interpret the statute as [I] think the state's highest
court would interpret it." *Frye v. Auto-Owners Ins. Co.*, 845 F.3d 782, 786 (7th Cir. 2017)
(citing *United States v. Mohamed*, 759 F.3d 798, 804 (7th Cir. 2014)). As the parties'
briefing reflects, there are very few cases interpreting the relevant provisions in the
UCCC, and the Indiana Supreme Court does not appear to have weighed in on the
matter. So I must do my best to follow the lead of Indiana courts, which "employ the
basic tools of statutory interpretation: Statutes are read as a whole, and words are given

their plain and ordinary meaning." *Id.* "The goal of statutory interpretation is to discern and further the intent of the legislature*." West v. Off. of Indiana Sec'y of State*, 54 N.E.3d 349, 353 (Ind. 2016) (citing *Moryl v. Ransone*, 4 N.E.3d 1133, 1137 (Ind. 2014)). To accomplish this task, Indiana courts "start with the plain language of the statute, giving its words their ordinary meaning and considering the structure of the statute as a whole," attempting to "harmonize any inconsistencies" while "exercis[ing] caution so as not to add words or restrictions where none exist." *Id.* (citing *Moryl*, 4 N.E.3d at 1137; *Tyson v. State*, 51 N.E.3d 88, 91 (Ind. 2016); *Kitchell v. Franklin*, 997 N.E.2d 1020, 1026 (Ind. 2013)).

Here's the issue as I see it: Subsection (3) codifies a debtor's "right to a refund" in the event of a "charge in excess of that allowed" under the UCCC – making clear that if a debtor pays "an amount in excess" of his lawful obligations, he "may recover the excess amount from the person who made the excess charge or from an assignee of that person's rights[.]" Ind. Code § 24-4.5-5-202(3). But Subsection (3) says nothing about the applicable statute of limitations for a claim under the UCCC. Subsection (4) then expressly provides that "[w]ith respect to excess charges arising from . . . consumer credit sales or consumer loans, no action pursuant to this subsection may be brought more than one (1) year after the due date of the last scheduled payment of the agreement pursuant to which the charge was made." *Id.* The General Assembly has separately codified a general ten-year statute of limitations, which applies where "one has not otherwise been provided by a more specific statutory scheme." *See* Ind. Code

§ 34-11-1-2; *Ind. Spine Grp., PC v. Pilot Travel Ctrs., LLC*, 959 N.E.2d 789, 794 (Ind. 2011) (internal quotation omitted).

Ratulowski argues that his claims are subject to the default ten-year statute of limitations because Subsection (3) contains no express limitations period. PNC responds that Subsection (3), while codifying a debtor's "right to a refund," does not provide a private cause of action for violations of the UCCC. Rather, Subsection (4) sets forth the cause of action – and that separate provision expressly requires debtors to bring their claims within a year after the due date of the last scheduled payment on a finance agreement. As explained below, the text and structure of Section 202 reflect that Subsection (3) cannot be read in isolation to create a private right of action subject to the catchall ten-year statute of limitations. This conclusion is further supported by the absence of any cases clearly acknowledging such an independent right of action under the UCCC.

Initially, Subsections (1) and (2) provide "right[s] to *recover*" for violations of UCCC provisions "applying to limitations on the schedule of payments or loan term for supervised loans" and "applying to authority to make consumer loans," respectively. Ind. Code §§ 24-4.5-5-202(1), (2) (emphasis added). The statutory language is a little different, but both provisions clearly create a private right of recovery. Subsection (1) says a debtor "has a right to recover . . . a penalty in an amount to be determined by the court not in excess of three times the amount of the loan finance charge," whereas Subsection (2) simply says that a debtor "has a right to recover the payment" on the

14

principal or loan finance charges. Both subsections couple these rights of recovery with explicit one-year limitations periods for actions based on covered UCCC violations (none of which are relevant here).

Subsection (3) then provides that a debtor "has a right to a refund" if he pays an "excess charge," and "may recover the excess amount" from the person who made the excess charge or their assignee. *Id.* § 24-4.5-5-202(3). Ratulowski argues that this language is similar to the "right to recover" language in Subsections (1) and (2). But it's meaningfully different. Subsection (3) says that he has a "right to a *refund*" and "may recover the excess amount" that he was charged – ***not*** that he has a "right to recover" the excess charges or a penalty in the amount of the excess charges. Subsection (4) picks up right where this "right to a refund" leaves off. The interrelationship between these provisions is signaled from the outset: "*If* a debtor is *entitled to a refund*" (meaning under Subsection(3)) "and a person liable to the debtor refuses to make a refund within a reasonable time after a demand," the debtor "may *recover* . . . a *penalty* in the amount to be determined by a court," not to exceed ten times the amount of the excess charge. *Id.,* § 24-4.5-5-202(4) (emphasis added).

Like Subsections (1) and (2), Subsection (4) requires a plaintiff to bring "an action pursuant to this subsection" within a year after the due date of the last scheduled payment on their finance agreement. *Id.* And just like Subsection (1), Subsection (4) enables a debtor to recover "a penalty," to be determined by a court and equal to the excess charge (or up to ten times that amount). Another cue that Subsection (3) cannot

be read in isolation to create a right of action is embedded elsewhere in Section 202. Subsection (7) specifies that creditors may raise the defense that a violation is unintentional or the product of a bona fide error, such that "no liability is imposed under subsections (1), (2), and (4)." *Id.*, § 24-4.5-5-202(7). This signals that Subsections (1), (2) and (4) are where the causes of action lie. Finally, while Subsections (1), (2), and (4) each contain similar limitations periods, Ratulowski's interpretation of Subsection (3) would oddly allow similar claims to be brought up to *ten years* after a final payment on a debt. Such a reading is not sensible in the context of "the structure of the statute as a whole." *See West*, 54 N.E.3d at 353.

There is some support for Ratulowski's contrary interpretation. Subsection (4) plainly states that the one-year statute of limitations applies to "action[s] pursuant to *this subsection*." That would ordinarily mean only Subsection (4), not also "action[s] pursuant to" Subsection (3). Ratulowski notes that when the state legislature includes "a definite provision . . . with reference to one particular subdivision of a section of the law, . . . and a similar reference is omitted from the *other subdivisions as well as from the rest of the section*, the particular reference is intended to apply solely to the subdivision in which it is contained and to exclude its application from all of the rest." *Romack v. State*, 446 N.E.2d 1346, 1353 (Ind. Ct. App. 1983) (emphasis added) (quoting *Highland Sales Corp. v. Vance*, 186 N.E.2d 682, 685 (Ind. 1962)).

This argument has some appeal. But, again, it presupposes that Subsection (3)'s text can be read to create a private cause of action. As described above, in the context of

the overall statutory scheme, Subsection (3) merely creates a "right to a refund" that may be pursued via an "action" under related Subsection (4). Ratulowski's argument also reads out an important caveat to the canon of construction discussed in *Romack*. Here, "a similar reference" to a one-year statute of limitations appears elsewhere in "the rest of the section." In other words, Sections 202(1) and Section 202(2) also provide for one-year statutes of limitations that apply to actions "pursuant to *this subsection*." So, at the very least, it's unclear whether the limitation in Subsection (4) *only* applies to that subsection, as Ratulowski suggests.

While the relevant analysis is driven by statutory text and structure, it's also important to note that Ratulowski, while given the opportunity to present oral argument and submit supplemental authority on this key issue, has been unable to identify even a *single case* in which a party asserted a claim pursuant to a supposed cause of action in Subsection (3). [*See* DE 73; DE 74; DE 78.] There are, admittedly, few cases on point. But the two brought to my attention certainly do not carry much water.

Initially, *Wenning v. Jim Walter Homes, Inc.*, 606 F.2d 784 (7th Cir. 1979) involved claims brought under Section 202(1) and 202(4) – it cannot be read to support an independent right of action to recover refunds under Subsection (3). *See id.* at 785. The case is of some use here, insofar as it held that for purposes of claims under Section 202(1) or 202(4), the statute of limitations begins to run on the date of an early payoff (as opposed to the originally scheduled date for a debtor's final payment) – meaning that the clock started ticking when Ratulowski traded in his car and made the early payoff in

April 2020. *See id.*

The other case also involved Jim Walter Homes and was decided a few years later – *Kendrick v. Jim Walter Homes, Inc.*, 545 F. Supp. 541 (S.D. Ind. 1981). This case also cannot be read to support an independent right of action under Subsection (3). Rather, it appears that the plaintiff again asserted claims under Section 202(1) and 202(4); the court determined that on the record presented she could not obtain penalties under Section 202(4) and was "limited to that proscribed by" Section 202(1). *Id.* at 542–43. The decision contains a stray reference to Subsection (3), but in context it does not suggest the plaintiff was independently proceeding on a claim for violation of that part of the statute – unless to the extent such a claim was part-and-parcel of her claim for a penalty under Subsection (4). *See id.* at 543.

After independently researching the issue, the Court has not found any support in Indiana case law for Ratulowski's position that Subsection (3) provides a private right of action subject to the default ten-year statute of limitations. The only matter presented in the parties' briefing that appears to have involved a claim for a refund under the UCCC is *Wenning*, and in that case the Seventh Circuit affirmed a holding that such a claim was barred by the one-year statute of limitations. While it is well established that the state legislature may implicitly create private rights of action, *see Blanck v. Ind. Dep't of Corr.*, 829 N.E.2d 505, 509 (Ind. 2005), the Indiana Supreme Court has "'long been reluctant' to infer this unwritten intent, since the legislature often creates rights of action using clear language." *Doe #1 v. Ind. Dep't of Child Servs.*, 81

N.E.3d 199, 202 (Ind. 2017) (quoting *F.D. v. Ind. Dep't of Child Servs.*, 1 N.E.3d 131, 143–44 (Ind. 2013)). In sum, the lack of any case law endorsing a reading of Section 202(3) as creating a private right of action substantially reinforces the commonsense reading of the statute outlined above, and I decline to imply a right of action under that subpart where Section 202(4) expressly contemplates private actions to recover refunds of excessive charges.

For the reasons addressed above, Ratulowski's new UCCC claims are subject to the one-year statue of limitations in Indiana Code § 24-4.5-5-202(4). The limitations period began to run when he made an early payoff on his finance agreement and GAP Addendum in April 2020, and it expired more than nine months before the filing of this lawsuit in January 2022. Because it is clear that Section 202(3) does not supply a right of action and Ratulowski's claims are time-barred under the statute of limitations codified in Section 202(4), I will not proceed to consider the balance of PNC's arguments for dismissal of Counts II and III.

## II.    Money Had and Received

Under Indiana law, "money had and received" is an equitable remedy in the nature of unjust enrichment. It is available where the defendant has received money from the plaintiff under "circumstances that in equity and good conscience he ought not to retain" the funds (*i.e.,* because the money belongs to the plaintiff) and the money was received without consideration. *T-3 Martinsville, LLC v. US Holding, LLC*, 911 N.E.2d 100, 122 (Ind. Ct. App. 2010) (internal quotation omitted). The Indiana Court of Appeals

has held that "the existence of an express contract precludes recovery on the equitable theory of money had and received." *Id.* at 123 (quoting *Shelby Eng'g., Inc. v. Action Steel Supply, Inc.*, 707 N.E.2d 1026, 1028 (Ind. Ct. App. 1999)). For example, the court in *T-3 Martinsville*, observing the parties had an express contract, held that the plaintiff was precluded from recovering under either equitable theory of money had and received or unjust enrichment. *Id.* at 123–24 (citing *City of Indianapolis v. Twin Lakes Enterprises, Inc.*, 568 N.E.2d 1073, 1079 (Ind. Ct. App. 1991)).

Ratulowski has pleaded the existence of an express contract and will be permitted to proceed with his contract claim. Consequently, he is precluded from proceeding on his parallel equitable claim. *Accord Page v. Alliant Credit Union*, 2021 WL 1688176, at *3 (N.D. Ill. Apr. 29, 2021). Ratulowski asserts that he can maintain this claim, despite the existence of an express contract between the parties, because the contract contains a provision prohibited by Indiana law. *See Lawson v. First Union Mortg. Co.*, 786 N.E.2d 279, 284 (Ind. Ct. App. 2003). But as I have already explained, his new claims under the UCCC (*i.e.*, the basis to assert PNC violated state law by first charging supposedly "unauthorized" GAP fees and then withholding unearned fees after his early payoff) do not state a claim on which relief may be granted. Accordingly, Ratulowski's tag-along "money had and received" claim will be dismissed.

### Motion to Strike

PNC has also moved to strike Ratulowski's class claims. Recall that he seeks to proceed on three different sets of class claims. These fall into two buckets. On one hand,

Ratulowski seeks to proceed on behalf of a "breach of contract" class consisting of

Indiana consumers with similar express terms in their GAP agreements (Count I). On

the other hand, he seeks to proceed on behalf of "unlawful business practice" and

"excessive fee" classes, based on PNC's alleged violations of the UCCC (Counts II–III).

Counts II and II will be dismissed for the reasons addressed above, so PNC's motion is

moot as to the putative excessive fee and unlawful business practice classes. While PNC

presents some reasons why Ratulowski's putative breach of contract class may face

challenges at class certification, this is not a case in which the class allegations are

"facially and inherently deficient," such that they should be stricken from the

complaint. *See Cholly v. Uptain Group, Inc.*, 2015 WL 9315557, *3 (N.D. Ill. Dec. 22, 2015)

(quoting *Buonomo v. Optimum Outcomes, Inc.*, 301 F.R.D. 292, 295 (N.D. Ill. 2014)).

Rule 23(a) of the Federal Rules of Civil Procedure provides an action may be

certified as a class action if:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class; (3) the claims or
> defenses of the representative parties are typical of the claims or defenses
> of the class; and (4) the representative parties will fairly and adequately
> protect the interests of the class.

There are two other requirements for class certification: "questions of law or fact

common to class members" must "predominate over any questions affecting only

individual members," and a class action must be "superior" to other methods of

adjudication. Fed. R. Civ. P. 23(b)(3). Rule 23(c)(1)(A) requires courts to determine

whether to certify an action as a class action "[a]t an early practicable time" in the case,

and Rule 23(d)(1)(D) permits courts to enter orders that "require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly." Before the plaintiff seeks to certify a class, the defendant may file a motion under Rule 12(f) to "'strike class allegations at the pleading stage when they are facially and inherently deficient,' particularly when the dispute is not factual and discovery is unnecessary to resolve it." *Miles v. Am. Honda Mot. Co., Inc.*, 2017 WL 4742193, at *5 (N.D. Ill. Oct. 19, 2017) (quoting *Cholly*, 2015 WL 9315557 at *3). *See also Huddleston v. Am. Airlines*, Inc., 2018 WL 4742097, at *2 (N.D. Ill. Oct. 2, 2018); *Buonomo*, 301 F.R.D. at 295.

PNC's arguments to strike the breach of contract class target the commonality, predominance, and superiority requirements. More specifically, PNC argues that individualized inquiries are needed to determine whether each consumer's contract contains similar cancellation and termination provisions to Ratulowski's GAP Addendum. PNC further argues that GAP administrators or dealers may have to be joined as parties to the case, because they are the parties that actually collected the fees at issue (PNC contends that it does not directly administer the collection of GAP fees), which would make the case unmanageable as a class action. To state the obvious, these arguments are better taken up on the *facts*, rather than evaluated based on the parties' competing *representations* about the nature and scope of the GAP agreements in question.

Ratulowski argues that through discovery he will obtain copies of various GAP

agreements entered by Indiana customers with PNC's auto finance arm (or later assigned to the company). Because many appear on very similar forms, he further argues, it will be possible to identify a universe of GAP agreements that contain similar terms at an appropriate level of semantic generality. He will seek class certification on the basis of those identified GAP agreements. If PNC disputes that the cited agreements contain substantially similar terms, it can take up that fight on the facts presented at class certification – at which point, of course, Ratulowski will bear the burden of proof. Here, by contrast, PNC bears the burden to strike the class allegations; its (self-serving) characterization of the array of agreements Ratulowski may seek to include as part of the breach of contract class is not enough to carry the day. Moreover, as Ratulowski points out, only PNC and the customer are parties to the relevant GAP agreements. As plausibly alleged in the complaint, PNC stands in privity with the customer and is therefore the only party that may owe a refund obligation under the agreements. On balance, Ratulowski makes a persuasive showing that it will not be necessary (or procedurally appropriate) to join hundreds of dealers and GAP administrators into this dispute about fees PNC has allegedly collected and retained.

In sum, I am unpersuaded that the breach of contract class allegations are facially and inherently deficient, such that they should be cut off at the pleadings. If and when Ratulowski seeks certification of his breach of contract class, it will be for me to decide whether the facts in the record support class treatment or, as PNC forcefully argues, such a class would be hopelessly unmanageable. But that will be a question for another

day, to be answered with the benefit of a more robust factual record.

### Leave to Amend

Ratulowski requests thirty days for leave to amend his complaint for the third time. [DE 66 at 9, 28.] The foregoing analysis reflects that his new claims under the UCCC are time-barred, and his equitable claim rises and falls with those claims for violations of state commercial law. There is no reason to believe he can address those deficiencies consistent with the amended complaint he has already filed. *See Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 707 (7th Cir. 2021) (district court may deny leave to amend when amendment would be futile); *Arazie v. Mullane*, 2 F.3d 1456, 1464 (7th Cir. 1993) (court need not accept amended complaint where it is apparent that it fails to cure defects identified in original complaint). Moreover, I specifically told Ratulowski that this would be his "final opportunity" to amend his complaint, given the multiple prior rounds of amendment. [*See* DE 53 at 35.] So denial of leave to amend should come as no surprise to Ratulowski or his counsel.

### Conclusion

For the foregoing reasons, PNC's Motion to Dismiss Counts II–IV of Plaintiff's Second Amended Class Action Complaint [DE 61] is **GRANTED**, and Counts II–IV are **DISMISSED** for failure to state a claim on which relief may be granted. PNC's Motion to Strike Class Allegations from Plaintiff's Second Amended Class Action Complaint [DE 63] is **DENIED**.

> **SO ORDERED.**

ENTERED: July 29, 2024.

           /s/ Philip P. Simon

PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT